1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Kent R. Robison, Esq. (Bar No. 1167)                    **ELECTRONICALLY FILED:  08/31/07**
Clayton P. Brust, Esq. (Bar No. 5234)
Jennifer L. Baker, Esq. (Bar No.9559)
ROBISON, BELAUSTEGUI, SHARP & LOW
71 Washington Street
Reno, Nevada 89503
Telephone: (775) 329-3151
Facsimile:  (775) 329-7941
Attorneys for Defendants
Corporation of the Presiding Bishop of The Church
of Jesus Christ of Latter-Day Saints and
Corporation of the President of The Church of Jesus
Christ of Latter-Day Saints and Successors

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

DA-DAZE-NOM MANZANARES,

        Plaintiff,

    vs.                                                              **CASE NO. 07-CV-00076-LRH-RAM**

ELKO COUNTY SCHOOL DISTRICT, and
GARY LEE JONES, SR., as agent for ELKO
COUNTY SCHOOL DISTRICT, and GARY LEE
JONES, SR., individually, and CORPORATION
OF THE PRESIDING BISHOP OF THE
CHURCH OF JESUS CHRIST OF LATTER-
DAY SAINTS, a foreign corporation registered to
do business in the State of Nevada;
CORPORATION OF THE PRESIDENT OF THE
CHURCH OF JESUS CHRIST OF LATTER-
DAY SAINTS AND SUCCESSORS, a foreign
corporation registered to do business in the State
of Nevada; and Does 1-5, and XYZ Corporations
1-5.

        Defendants.
_____/

**AFFIDAVIT OF CLAYTON P. BRUST IN SUPPORT OF
MOTION FOR ORDER REQUIRING PLAINTIFF TO SUBMIT TO
INDEPENDENT MENTAL EXAMINATION**

STATE OF NEVADA     )
                       ) ss.
COUNTY OF WASHOE   )

    I, CLAYTON P. BRUST, being first duly sworn, under penalty of perjury affirm that the

following assertions are true to the best of my knowledge and belief:

ROBISON,
BELAUSTEGUI,
SHARP & LOW
A PROFESSIONAL
CORPORATION
ATTORNEYS AT LAW
71 WASHINGTON ST.
RENO, NEVADA 89503
TELEPHONE
(775) 329-3151

1.       I am a duly licensed attorney, authorized to practice in the State of Nevada and our firm represents Defendants Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints and Corporation of the President of the Church of Jesus Christ of Latter-Day Saints and Successors ("The Church") in this matter.

2.       Attached hereto and incorporated herein as Exhibit "A" are true and correct copies of correspondence dated August 27, 2007 and August 29, 2007 from me to Plaintiff's counsel, Jeffrey Kump requesting a stipulation for an Independent Medical Examination of Plaintiff.

3.       Additionally, I engaged in a telephone conversation with Mr. Kump on August 22, 2007 during which I requested Plaintiff submit to an Independent Medical Examination by psychological expert of my client's choosing for purposes evaluation of the psychological damages being alleged by Plaintiff and any causal link between my clients and Plaintiff's alleged psychological damages.   I have not received a response from Plaintiff since obtaining potential dates for the examination.

4.       Attached hereto as Exhibit "B" are relevant pages of Plaintiff's deposition transcript wherein she testified that her childhood was rife with physical and mentally abusive circumstances (pp. 26-29; 100-111) that she has relatively no knowledge of The Church, and that The Church was not an influencing factor in her decision to engage in a sexual relationship with Defendant Gary Jones.  (pp.41-56; 66-67)

5.       Attached hereto as Exhibit "C" is a true and correct copy of the Dr. Foote's Curriculum Vitae.

      DATED this _31st_ day of August, 2007.

Clayton P. Brust Esq.
Attorney for Defendants
Corporation of the Presiding Bishop of the
Church of Jesus Christ of Latter-Day Saints
and Corporation of the President of the
Church of Jesus Christ of Latter-Day Saints
and Successors

SUBSCRIBED and SWORN to before me this _3_ day of August, 2007.

NOTARY PUBLIC

W. OSBORNE
Notary Public - State of Nevada
Appointment Recorded in Washoe County
No: 93-2063-2 - Expires August 1, 2009

-2-

**CERTIFICATE OF SERVICE**

Pursuant to FRCP 5(b), I certify that I am an employee of ROBISON, BELAUSTEGUI, SHARP & LOW, and that on this date I caused a true copy of **AFFIDAVIT OF CLAYTON P. BRUST IN SUPPORT OF MOTION FOR ORDER REQUIRING PLAINTIFF TO SUBMIT TO INDEPENDENT MENTAL EXAMINATION** to be served on all parties to this action by:

_X_    placing an original or true copy thereof in a sealed, postage prepaid, envelope in the United States mail at Reno, Nevada.

_____    personal delivery/hand delivery

_X_    facsimile (fax)

_____    Federal Express/UPS or other overnight delivery

_____    Reno Carson Messenger Service

Jeffrey J. Kump, Esq.
Marvel & Kemp, Ltd.
217 Idaho Street
P.O. Box 2645
Elko, NV 89803-2645
Facsimile: (775) 738-0187
Attorneys for Plaintiff

Thomas P. Beko, Esq.
Erickson, Thorpe & Swainston, Ltd.
99 West Arroyo Street
P.O. Box 3559
Reno, NV 89505
Facsimile: (775) 786-4160
Attorneys for Defendant
Elko County School District

Kelly G. Watson, Esq.
Watson Rounds
5371 Kietzke Lane
Reno, NV 89511
Attorney for Defendant
Gary Lee Jones

Dated this 3\<sup>1st</sup> day of August, 2007.

_____
Employee of Robison, Belaustegui,
Sharp & Low

**Exhibit "A"**

LAW OFFICES OF
## ROBISON, BELAUSTEGUI, SHARP & LOW
A PROFESSIONAL CORPORATION

KENT R. ROBISON
THOMAS L. BELAUSTEGUI
F. DeARMOND SHARP
KEEGAN G. LOW
BARRY L. BRESLOW
MARK G. SIMONS

71 WASHINGTON STREET
RENO, NEVADA 89503
TELEPHONE (775) 329-3151
FACSIMILE (775) 329-7941
(775) 329-7169

MICHAEL E. SULLIVAN
CLAYTON P. BRUST
NATALIE J. REED
STEFANIE T. SHARP

JENNIFER L. BAKER

August 27, 2007

**Via Facsimile (775) 738-0187**
**and Original U.S. Mail**
Jeffrey J. Kump, Esq.
MARVEL & KUMP, LTD.
217 Idaho Street
Elko, NV 89803-2645

**Re:    Manzanares v. Corporation of the Presiding Bishop of The Church of Jesus Christ**
**of Latter-Day Saints and Corporation of the President of The Church of Jesus**
**Christ of Latter-Day Saints and Successors, et als**

Dear Mr. Kump:

I tried calling you this afternoon, but you were not available to talk with me.

As discussed in our prior conversation, we would like to have Ms. Manzanares evaluated by our expert in New Mexico. Dr. Foote is located in Albuquerque and is available September 12 and 13 for the evaluation. The evaluation will take two days. If traveling back and forth from her home is too burdensome for Ms. Manzanares, we will pay for a room for her near Dr. Foote's office.

As you know, the date for disclosure of experts is fast approaching. Please respond quickly and let me know if these dates are acceptable.

Sincerely,

Clayton P. Brust, Esq.

CPB/mcd

J:\WPData\Krr\1105.001\L-Kump 08-27-07.wpd

LAW OFFICES OF

ROBISON, BELAUSTEGUI, SHARP & LOW

A PROFESSIONAL CORPORATION

KENT R. ROBISON
THOMAS L. BELAUSTEGUI
F. DEARMOND SHARP
KEEGAN G. LOW
BARRY L. BRESLOW
MARK G. SIMONS

71 WASHINGTON STREET
RENO, NEVADA 89503
TELEPHONE (775) 329-3151
FACSIMILE (775) 329-7941
(775) 329-7169

MICHAEL E. SULLIVAN
CLAYTON P. BRUST
NATALIE J. REED
STEFANIE T. SHARP

JENNIFER L. BAKER

August 29, 2007

**Via Facsimile (775) 738-0187
and Original U.S. Mail**
Jeffrey J. Kump, Esq.
MARVEL & KUMP, LTD.
217 Idaho Street
Elko, NV 89803-2645

> **Re:    Manzanares v. Corporation of the Presiding Bishop of The Church of
> Jesus Christ of Latter-Day Saints and Corporation of the President of
> The Church of Jesus Christ of Latter-Day Saints and Successors, et als**

Dear Mr. Kump:

Earlier this week I sent a letter requesting a stipulation to have our expert, Dr. Foote, examine Ms. Manzanares on September 12 and 13, 2007 in Albuquerque, New Mexico. Please let me know whether this is acceptable as soon as possible. Otherwise, I will be forced to file a motion with the Court.

On a related note, we have not received any documents supporting Ms. Manzanares' claim for emotional suffering. As you know, FRCP 26(a)(1)(B)& (C) require that the Plaintiff produce all documents in the possession, custody, or control of the Plaintiff that will be used to support her claims and all materials bearing on the nature and extent of injuries the Plaintiff has suffered. Obviously, we will need these documents for our expert to appropriately examine Ms. Manzanares. Please provide those to me as soon as possible so I can forward them to our expert.

I look forward to hearing from you.

Sincerely,

Clayton P. Brust, Esq.

CPB/wo
cc: Thomas P. Beko, Esq.
cc: Kelly G. Watson, Esq.

J:\WPData\Krr\1105.001\L-Kump 08 29 07 [cpb].wpd

**Exhibit "B"**

Case No. 3:07-CV-00076

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA
-oOo-

DA-DAZE-NOM MANZANARES,

       Plaintiff,

       vs.

ELKO COUNTY SCHOOL DISTRICT, and
GARY LEE JONES, SR. As agent for ELKO
COUNTY SCHOOL DISTRICT, and GARY LEE JONES, SR.,
Individually, and CORPORATION OF THE
PRESIDING BISHOP OF THE CHURCH OF JESUS CHRIST
OF LATTER-DAY SAINTS, et al.,

       Defendants.

_____/



VIDEOTAPED DEPOSITION OF

DA-DAZE-NOM MANZANARES

June 26, 2007

Reno, Nevada

SUNSHINE REPORTING SERVICES
(775) 883-7950 or (775) 323-3411
REPORTED BY: GAIL R. WILLSEY CA CSR 9748; NV CSR 359

DA-DAZE-NOM MANZANARES - 06/26/07

## Page 26

1   but please bear with me.
2       Was your father abusive of you?
3       A    Sexually, no. Mentally, yes. Physically,
4   yes.
5       Q    And would you describe for us, please, what
6   you mean by physically abusive?
7       A    Hit me with closed fists, open hand, anything
8   that's in his sight like a shoe, stick, a cord or
9   anything any hard object or anything, that's his way
10  of disciplining.
11      Q    Do you recall him being physically abusive of
12  Seferino?
13      A    Yes.
14      Q    The same way?
15      A    Yes.
16      Q    Were injuries sustained by you or Seferino,
17  as a result of this physical abuse?
18      A    Yes.
19      Q    What kind of injuries?
20      A    They would be like marks on our back. My
21  brother has a long scar on his back from the fire
22  poker.
23      Q    Oh, boy.
24      A    And I have a couple of marks on my back.
25      Q    From what?

## Page 27

1       A    From the same thing.
2       Q    A fire poker?
3       A    Yes.
4       Q    Was it hot?
5       A    No.
6       Q    Just one that you would use to shake up the
7   ashes?
8       A    Yes.
9       Q    And he would poke you with that?
10      A    Just go like hit you.
11      Q    With a fire poker?
12      A    Yes.
13      Q    And you have permanent scarring because of
14  that?
15      A    Yes.
16      Q    Any other type of physical abuse that he
17  would administer to you?
18      A    He once gave me a black eye.
19      Q    By striking you with his fists?
20      A    Yes.
21      Q    How old were you when that happened?
22      A    I was about six or seven.
23      Q    Okay.
24          Do you know whether or not that abuse was
25  ever reported to the authorities?

## Page 28

1       A    Once when I got the black eye because I went
2   to school the next day and my counselors and the
3   principal saw it. I tried covering it up, but they
4   didn't believe me.
5       Q    When you made that report, were you in the
6   same school?
7           I mean is Owyhee just one school, one
8   through --
9       A    K through 12.
10      Q    And what did the authorities do when they
11  found out that your father had beaten you?
12      A    All they did was just took me down to the
13  police department and took pictures and kind of like
14  threatened him to take us away. But they didn't
15  really do any further actions really like putting him
16  in jail or anything like that.
17      Q    But as far as the fire poker, the discipline
18  by striking with the fire poker, that was unreported?
19      A    No.
20      Q    That did not get to the authorities; correct?
21      A    No, it did not.
22      Q    Your mom, was she abusive?
23      A    To me?
24      Q    Yes.
25      A    No.

## Page 29

1       Q    To anyone else?
2       A    No.
3       Q    To your brother or sister?
4       A    No. I mean she would give us a spanking but
5   not to the extent of bruising and big welts on your
6   legs or blood or anything like that.
7       Q    You told me that your father also caused you
8   to suffer emotional abuse.
9       A    Yes.
10      Q    And would you describe that for us, please?
11      A    I was afraid to do a lot of things. Each
12  time I would do something if it's not up to his
13  standards, he'll like I guess you could say beat me
14  and stuff like that.
15      Q    That caused you to be constantly fearful and
16  some anxiety about the way that you were conducting
17  yourself?
18      A    Yes.
19          I would always flinch if he would raise his
20  hand to do something or if he would come near me, I
21  would go like that like a little puppy.
22      Q    Yeah, right.
23          Did you ever receive any treatment,
24  assistance because of this emotional or physical
25  abuse?

DA-DAZE-NOM MANZANARES - 06/26/07

Page 38

1     A    Okay.

2     Q    I'm not going to talk to you about that right

3 now but you have given a video and an audio recorded

4 statement to the Elko Police Department.

5     Do you remember that?

6     A    No.

7     Q    With Miss Bowers?

8     A    I don't remember.

9     Q    You sat in a little room.

10     I can play some of it for you and it might

11 refresh your recollection; do you want me to do that?

12     A    Yes.

13     Q    All right.

14     Let me ask some preliminary questions.

15     A    Okay.

16           (Exhibit B was marked.)

17 BY MR. ROBISON:

18     Q    This is our transcript, Exhibit B, of that

19 statement. I'm going to show you the video in a

20 moment but what I want to do is ask you to turn to

21 Page 8 and 9 of the transcript Exhibit B.

22     Now, Page 8, Detective Connie Bowers is

23 trying to find out what I'm trying to find out and

24 that's when you first met Gary Jones. Are you with

25 me?

Page 39

1     A    Yes.

2     Q    All right.

3     Let's start at the top of Page 8. You say,

4 "But they came over to help you and your mother."

5     "Yes."

6     "Get through this period when your dad went

7 to prison?" You say "Uh-huh."

8     "So how did your relationship start with

9 him?" And you say, "I didn't really like him at

10 first. I hated his guts." She says, "Okay, that's

11 honest." You say, "I was afraid of him. A

12 little later on, I started growing out of that." She

13 says, "What caused you to do that?" And you say, "I

14 don't know. He started to be nice to me I guess."

15 She says, "How was he nice?" And you say, "Like any

16 uncle would treat you or aunt would treat you, like

17 your mom would treat you."

18     The question is asked, "So you came to look

19 at him first as an uncle figure or something?"

20     "Uh-huh."

21     "Okay." Your answer, "Well, my aunt and my

22 mom and some of my relatives were telling me that he

23 was my uncle and his sister was telling me that." She

24 says "What?" And you say, "His sister was telling me

25 that he was my uncle and she was my aunt."

Page 40

1     Then she says "Okay. And so did you and he

2 start doing things together?" And you say, "Uh-huh.

3 Not until gee I think six or seven months later."

4     I read that to understand that about six or

5 seven months after you met Gary Jones, this physical

6 relationship evolved?

7     A    Yes.

8     Q    And you say in this statement that that

9 started at the motel in Elko?

10     A    Yes.

11     Q    So that we know is November of 2001?

12     A    Yes.

13     Q    So do you believe that was six or seven

14 months before the Elko situation where you first met

15 Gary Jones?

16     A    Yes.

17     Q    Is this truthful testimony?

18     A    Yes, I do remember now.

19     Q    Okay.

20     Then I won't have to play the tape right now.

21 I'll play it later.

22     A    No.

23     Q    Okay.

24     So we're going to go forward in this case

25 believing that you met Gary Jones about May or June of

Page 41

1 2001, deal?

2     A    Deal.

3     Q    All right. I want to stop right there.

4     What faith were you in June of 2001?

5     A    It was called a non-denominal.

6     Q    Non-denomination?

7     A    Yes.

8     Q    You had never been to the Mormon church?

9     A    Like going to church?

10     Q    Right.

11     A    No. But yes, I've been in there. You know,

12 like for my mom used to have a friend that quilts and

13 I used to go help them quilt.

14     Q    Don't take me there, my wife does that.

15     A    Then I was small enough to climb under and

16 stick the needle through.

17     Q    But you didn't do that to go there for church

18 purposes?

19     A    No.

20     Q    You just went there because it was where your

21 mom was?

22     A    Right.

23     Q    And you had never participated in any Mormon

24 service?

25     A    No.

DA-DAZE-NOM MANZANARES - 06/26/07

Page 42

1   Q     Never been a member of any of the youth
2   groups in the Mormon church?
3   A     No.
4   Q     You don't know anything about the Mormon
5   church philosophies as of that time?
6   A     No.
7   Q     You were never given teachings or preachings
8   from the Mormon church at that time?
9   A     No.
10  Q     Correct?
11  A     Yes.
12  Q     I'm going to ask you whether or not you know
13  what the weekly sacrament services are about at the
14  Mormon church?
15  A     I don't know what that is.
16  Q     You have no idea?
17  A     I have no idea.
18  Q     Do you know about the weekly primary
19  situations that young girls were involved in in the
20  Mormon church?
21  A     No.
22  Q     Okay.
23        And you still don't have any knowledge about
24  that?
25  A     Still don't know.

Page 43

1   Q     All right.
2         Were you a member of any Young Woman's Relief
3   Society?
4   A     No.
5   Q     How about Society Services Group?
6   A     No.
7   Q     Never heard of that?
8   A     No.
9   Q     Don't know anything about that Mormon --
10  A     No.
11  Q     And you didn't go to Sunday school?
12  A     No.
13  Q     At the Mormon church?
14  A     No.
15  Q     You don't know anything about what they do in
16  Sunday school?
17  A     No, I don't.
18  Q     Do you know anything about the monthly fasts
19  at the Mormon church?
20  A     No.
21  Q     Do you know anything about the testimony
22  meetings at the Mormon church?
23  A     No.
24  Q     Do you know anything about the baptism
25  services at the Mormon church?

Page 44

1   A     No.
2   Q     Have you ever participated or attended a
3   baptism at the Mormon church?
4   A     No.
5   Q     Do you know how they're done?
6   A     I think so.  I don't know.
7   Q     And is that something you just heard from
8   your friends?
9   A     Yes.
10  Q     How about a confirmation, do you know what
11  that is?
12  A     No.
13  Q     Do you know whether or not any of your
14  friends have ever been confirmed?
15  A     No.
16  Q     All right.
17        Ever been to a Mormon baby blessing?
18  A     I didn't even know they had those.
19  Q     All right.
20        It's safe to say, is it not ma'am, that
21  you've never ever been affiliated with the Mormon
22  church?
23  A     Never ever.
24  Q     And you don't know anything about the Mormon
25  church; correct?

Page 45

1   A     No. I do not.
2   Q     I still have to ask these questions.  I know
3   the answer but I still have to ask them.
4         You haven't gone to any church functions?
5   A     No.
6   Q     And you haven't gone to any Mormon church
7   dinners?
8   A     No.
9   Q     And you haven't gone to any of the talent
10  programs?
11  A     No.
12  Q     Never participated in their talent programs?
13  A     No.
14  Q     Never been a participant or an observer of
15  their Christmas or holiday functions?
16  A     No.
17  Q     Have you or have you not?
18  A     No.
19  Q     Have you been at their holiday functions?
20  A     No.
21  Q     You have no familiarity at all with the
22  church structure; do you, ma'am?
23  A     No.
24  Q     And have you ever been requested to serve as
25  a leader in the church?

DA-DAZE-NOM MANZANARES - 06/26/07

13 (Pages 46 to 49)

### Page 46

1  A   No.

2  Q   Have you ever been requested to be a member

3  of the church?

4  A   No.

5  Q   Have you ever paid a tithing?

6  A   No.

7  Q   Do you know what a tithing is?

8  A   You give money to them.  I don't know.

9  Q   Okay.

10      In any event, you haven't done it; correct?

11  A   No.

12  Q   How about fast offerings?

13  A   No. I wish they would give an offering to me.

14  Q   All right.

15      But you haven't participated in fast

16  offerings with the Mormon church, have you?

17  A   No.

18  Q   No participation at all in home teaching

19  programs?

20  A   No.

21  Q   Ever sat down and prayed with anybody from

22  the Mormon church?

23  A   No.

24  Q   Every received any spiritual guidance from

25  anybody at the Mormon church?

### Page 47

1  A   No.

2  Q   Have you ever been indoctrinated or taught

3  about the Mormon church beliefs and philosophies by

4  anybody?

5  A   Yes, by my aunt, my Dad's sister.

6  Q   What's her name?

7  A   Lucille Grover.

8  Q   Was she a resident of Owyhee?

9  A   No. She lives in Salt Lake, Utah.  She used

10  to but now she lives somewhere I don't know where she

11  lives

12      Is Lucille your aunt on your mother's side?

13  A   No, on my Dad's side.

14  Q   That's your Dad's sister?

15  A   Yes.

16  Q   Did Aunt Lucille talk to you about Mormon

17  philosophies and beliefs?

18  A   All she said is that I should become a Mormon

19  and stuff like that.

20  Q   Oh, I see.

21      So she thought that it might be in your best

22  interests to become a member of their church?

23  A   Yeah.  I told her that they're crazy, and she

24  got mad at me.

25  Q   And your belief is your belief.

### Page 48

1      Why do you think they're crazy?

2  A   I don't know.  They just have weird beliefs,

3  I guess.

4  Q   Is that what you've heard from your friends?

5  A   Even on T V.

6  Q   And the things that have occurred in your

7  life that make you think that the Mormon church is

8  crazy, as you put it, is things that you've heard from

9  friends or seen on TV?

10  A   Yes.

11  Q   And not from Gary Jones?

12  A   No.

13  Q   And Gary Jones never tried to preach to you?

14  A   No.

15  Q   He never tried to convert you?

16  A   He did once but I told him "No," I didn't

17  want to.

18  Q   Are you aware that the Mormon church is

19  actually run by lay people?  Do you know what I mean

20  by that?

21  A   What?

22  Q   They don't go to seminaries.  They don't go

23  to school to be priests; did you know that?

24  A   Huh-huh.

25  Q   Anyway, Gary Jones never tried to put the

### Page 49

1  Mormon beliefs in your head, did he?

2  A   No.

3  Q   And you never looked to him as some kind of

4  pastor or minister to help you spiritually, did you?

5  A   No.

6  Q   And you never imposed trust or confidence in

7  him from a spiritual sense?

8  A   No.

9  Q   All right.

10      Gary Jones became a friend of yours; correct?

11  A   Yes.

12  Q   And then it later evolved into a

13  relationship?

14  A   Yes.

15  Q   But that had nothing to do with the Mormon

16  church; correct?

17  A   At first, there was this lady that told me to

18  go talk to him.  After she knew that my dad had left,

19  told me to go talk to him for counseling and stuff

20  like that but I never really took it into

21  consideration.  I was young and I didn't want to

22  listen to anybody.

23  Q   I understand that.

24      You never went to Gary Jones, even what that

25  lady said for spiritual guidance?

DA-DAZE-NOM MANZANARES - 06/26/07

14 (Pages 50 to 53)

## Page 50

1  A    No, I did not. I told my mom, and my mom
2  just started laughing. "You don't need that."
3     Q    And now as I understand the situation though,
4  is that after your father was apprehended and after
5  you came back from the shelter, the Mormon church
6  tried to help your family?
7     A    Yes, with food.
8     Q    And you're not critical of the church for
9  trying to help your family, are you?
10    A    No, I'm not, that was a good thing that they
11 did because we were on the down side.
12    Q    Right and the Mormon church I think got you
13 some food services?
14    A    Yes.
15    Q    And that was welcomed and you're thankful for
16 that; correct?
17    A    Yes.
18    Q    And they also I think got some clothing; do
19 you remember that?
20    A    I just know the food part, not the clothes.
21    Q    You're not blaming, in this case, the Mormon
22 church for assisting your family, are you?
23    A    No.
24    Q    That's something that you're grateful for?
25    A    Yes.

## Page 51

1     Q    And Mr. Jones was the person that had helped
2  get you that Mormon assistance, that Mormon church
3  assistance?
4     A    I believe so.
5     Q    You don't hold that against Mr. Jones, do
6  you?
7     A    No.
8     Q    And are you grateful to Mr. Jones at least
9  for --
10    A    Helping us out with the food, yes.
11    Q    Through the Mormon church?
12    A    Yes.
13    Q    All right.
14    A    Because I don't think anybody else would.
15    Q    Right.
16         Okay. So after the assistance is given to
17 your family, is this that time where you indicate that
18 you kind of hated him?
19    A    Yes.
20    Q    Even though Mr. Jones is getting the Mormon
21 church to provide food assistance for your family, you
22 don't like him at that time?
23    A    No.
24    Q    How long was it after the Mormon church
25 helped your family that you began to feel differently

## Page 52

1  about Mr. Jones?
2     A    I would say about two or three months after
3  when my mom started talking to me saying that, "You
4  shouldn't be that way," and stuff like that.
5     Q    When she said "that way --
6     A    Like being rude --
7     Q    And hateful?
8     A    Yes.
9     Q    Did Mr. Jones ever talk to you about any of
10 the Mormon church activities?
11    A    No.
12    Q    Did he ever mention primary activities for
13 children young children age three to ten?
14    A    All he said was just like they do fun things
15 like arts and crafts.
16    Q    But you weren't interested?
17    A    No.
18    Q    Did he mention anything about the Merry Miss
19 activities?
20    A    The what?
21    Q    Merry Miss?
22    A    I don't know what that is.
23    Q    All right.
24         Did he indicate -- did he mention anything to
25 you about the beehive activities?

## Page 53

1     A    I have no idea what that is.
2     Q    That's a program set up for girls between 12
3  and 18 years old within the church. No discussion
4  with Mr. Jones about beehive activities?
5     A    No.
6     Q    Did he mention anything to you about Mea maid
7  Activities?
8     A    No.
9     Q    Do you know what that is?
10    A    No.
11    Q    Ever heard of it before today?
12    A    No.
13    Q    Those are church activities for girls between
14 the age of 14 and 15. Is this the first time you've
15 heard that?
16    A    The first time ever.
17    Q    And Mr. Jones never mentioned that to you?
18    A    No.
19    Q    And how about laurel activities?
20    A    No.
21    Q    Mr. Jones never mentioned anything about
22 laurel activities for girls in the church age 16 to
23 18?
24    A    No.
25    Q    How about the combined youth activities, did

DA-DAZE-NOM MANZANARES - 06/26/07

Page 54

1  he ever talk about that other than the arts and
2  crafts?
3      A    No.
4      Q    He didn't try to make you or suggest to you
5  that you should be part of these activities, did he?
6      A    No. All he said is, "You should just try it
7  out."
8      Q    You made a pretty definite answer to that,
9  didn't you?
10     A    Yes.
11     Q    And it would fair to say, in this case ma'am,
12 that you made it clear to Gary Jones that you wanted
13 nothing to do with the Mormon church?
14     A    Yes.
15     Q    And it's still your position?
16     A    Yes.
17     Q    So if I start working on you, it's not going
18 to work?
19     A    It won't work.
20     Q    Do you know anything about the Temple?
21     A    You mean that big thing that goes like that?
22 Is it a church or what?
23     Q    Yeah. Well, you've answered my question.
24          Do you know what a Branch President is in the
25 Mormon church?

Page 55

1      A    Isn't it like a co-pastor or something. I
2  really don't know.
3      Q    Do you know what, if any, position Mr. Jones
4  had with the Mormon church when you and he were
5  involved?
6      A    At the time, I think he was the Bishop,
7  that's what they called him.
8      Q    Who called him that?
9      A    The church people, church members.
10     Q    Do you know where the church was located in
11 Owyhee?
12     A    Yes, over by the hospital.
13     Q    Do you know what Mr. Jones did there?
14     A    Preach, I guess.
15     Q    But he never preached to you?
16     A    No.
17     Q    And you never prayed together?
18     A    No.
19     Q    Did you share your -- your religious beliefs,
20 your spiritual beliefs, did you share those with him?
21     A    No.
22     Q    Was that something not involved?
23     A    No.
24     Q    So it would be fair to say that your
25 relationship with Mr. Jones had nothing to do with

Page 56

1  religion?
2      A    No.
3      Q    Well, wait a minute, we're both saying the
4  same thing.
5          Is it true that your relationship with Mr.
6  Jones had nothing to do with religion; correct?
7      A    Correct.
8      Q    Okay. Thank you.
9          I have the statement in front of you. I want
10 to kind of walk through it with you, if you don't
11 mind. We're on Page 8, and we went through a little
12 bit on Page 9. I want to turn to Page 10.
13         You give the detective in this statement
14 about line six you say, "Okay. It's coming back."
15 She asked the question. "Okay. Explain to me what
16 happened at the Owyhee -- let me do this. I'm going
17 to move ahead to Page 25.
18         After I show you the videotape, ma'am, I'm
19 going to ask you some questions about what's on Page
20 25 of the transcript. I think the record should
21 reflect that the court reporter is not going to
22 transcribe what's being played at this time.
23         (The tape was played.)
24 BY MR. ROBISON:
25     Q    All right.

Page 57

1          Do you recall now, after seeing the video,
2  giving the statement to Detective Bowers?
3      A    Yes.
4      Q    And that is you in the video?
5      A    Yes.
6      Q    And our transcript of the video reflects that
7  that statement was given, ma'am, on February 3, excuse
8  me, February 4, 2003?
9      A    Okay.
10     Q    I think that this would have been after you
11 came back from Boise?
12     A    Yes.
13     Q    And you just resumed the school year?
14     A    Yes.
15     Q    Where you tried to make up for that lost
16 time; correct?
17     A    Yes.
18     Q    Now, did you know the importance of telling
19 Miss Bowers the truth?
20     A    Yes.
21     Q    And did you tell her the truth?
22     A    Yes.
23     Q    Now, in this statement, as we see on page --
24 I think we should start with Page 24 or 25. We'll
25 start at the top. Are you with me?

DA-DAZE-NOM MANZANARES - 06/26/07

Page 66

1    A    Yes.

2    Q    And you are saying in these notes that you

3 love Gary Jones?

4    A    Yes.

5    Q    And at the time you thought you did?

6    A    Yes.

7    Q    But we don't see any notes where you say you

8 were afraid of him.

9         After you've had the sex the first time in

10 the truck; right?

11   A    Uh-huh.

12   Q    You weren't afraid of him after that, were

13 you?

14   A    No.

15   Q    And it still was a situation where he was

16 spending money on you; correct?

17   A    Yes.

18   Q    And you thought you had a feeling of love for

19 him?

20   A    Yes.

21   Q    And that's why you had these intimate

22 relationships?

23   A    Yes.

24   Q    Okay.

25        He never tried to put any guilt trip on you

Page 67

1 religiously or spiritually, did he?

2    A    No.

3    Q    He never used any of the Mormon philosophies

4 or beliefs to get you to consent to sex, did he?

5    A    No.

6    Q    Again, religion was kind of a deal breaker;

7 wasn't it?

8    A    Yes.

9    Q    All right.

10        Other than the vaginal sex and touching of

11 the breasts and the private parts, no other type of

12 sex; correct?

13   A    No.

14   Q    All right.

15        After Mr. Jones in August of 2002, there was

16 a suicide attempt; correct?

17   A    Yes.

18   Q    You went to Boise for a while and you

19 received some treatment?

20   A    Yes.

21   Q    What kind of treatment?

22   A    Psychological.

23   Q    All right.

24        Did it help?

25   A    Yes, some of it did.

Page 68

1    Q    Let me ask you and I want you to explain this

2 answer to me because if you turn to Page 31 of this

3 transcript of you giving a statement to Detective

4 Bowers, 31, please, and you start really on Page 30,

5 the last question.

6         She asked you, "Did you talk to anybody about

7 this in Boise about the suicidal tendencies?"  And you

8 say "Uh-huh."

9         Then on Page 31 she says, "And then --", you

10 answered, "At the blank treatment because I inaudible

11 treatment, I wouldn't be cutting myself."  And then

12 she says, "Do you think you still need help?"  And you

13 said "No," or you actually said "Nope."  Was that

14 truthful?

15   A    Yes.

16   Q    So would it be fair to say in this case, to

17 the judge and jury, that as of February 4, 2003, you

18 did not need any more help?

19   A    After then at that time, no, because I didn't

20 want -- I didn't want to be sent back where I was at.

21 I didn't like it there.

22   Q    At Boise?

23   A    Yes.

24   Q    You didn't like the people?

25   A    No.

Page 69

1    Q    Why?

2    A    I don't know, they were just -- I guess I

3 didn't like to be watched all the time.

4    Q    I don't like to be watched either.

5    A    I wanted privacy.

6    Q    After Boise, have you received any medical

7 services, any treatment, psychological, psychiatric?

8    A    Yes.  I used to talk to this shrink.  He was

9 there Wednesdays and Fridays over at the hospital.

10   Q    The next several questions I'm going to ask

11 you a little bit about the treatment and things like

12 that but it's about 98 degrees in here.  So let's take

13 a recess and cool it down.

14        (A recess was taken.)

15 BY MR. ROBISON:

16   Q    Miss Manzanares, we just completed a recess.

17        Without telling me anything that may have

18 been discussed, did you have an opportunity to confer

19 with counsel during the recess?

20   A    Just say that again.

21   Q    Did you have an opportunity to talk to your

22 attorney during the recess?

23   A    About this, no.

24   Q    About your testimony today?

25   A    No.

Page 98

Ma'am, we're back on the record. Obviously, you understand you're still under oath?
A Yes.
Q When we left off, you were going through the siblings of your mother. You gave me your mother and Alfred, Juanita, Rudel and Irvin and if I understand what you told me, there with six total siblings that she had?
A Including my mom, yes.
Q So that's five.
There's your mom, Alfred, Juanita, Rudel, Irvin. That's five, is there one more?
A No.
Q So there's a total of five, then?
A Yes.
Q And then Lydia Harney was Irvin's daughter?
A Yes.
Q And her three triplets were the three triplets that came to live with your family?
A Yes.
Q And I think you said in 1998 or 1999; is that right?
A In '99.
Q Do you recall why it was that those three children had to come live with your family?

Page 99

A Their mother and father were neglecting them.
Q Do you recall the issue of them coming to live with you being discussed by your parents, prior to them coming to live with you?
A Yes, I do.
Q Was it a subject of some contention between your mother and father about them coming to live?
A No.
Actually, my dad wanted to have them come and live with us, so did my mom.
Q All right.
And at the time that they -- those three children come to live in your family, in your household, is your sister still living there?
A No.
Q Or had she already moved out?
A She had already moved out.
Q Did your sister ever live in the new home?
A No.
Q So she was gone even before you guys moved into the new home?
A Yes. She left in 1996.
Q So you and your brother and your mother and your father moved to the new home, and then the three grandnieces come to live; is that correct?

Page 100

A Yes.
Q All right.
You had indicated that you, as a child, had been subjected to a great deal of physical and emotional abuse by your father?
A Yes.
Q Can you tell me if you have any recollection as to the age at which that actually started?
A All the way from childhood as I was growing up.
Q As far back as you can recall?
A Yes, from about four.
Q Okay.
In my experience in situations such as this, I commonly hear from children that one of the children seems to get it worse than the others.
Did you have that experience in your family? Did one of your siblings seem to get it worse than the other two?
A Yes.
Q Who was the one that got it the worst?
A Me.
Q Okay.
And can you tell me if there's any reason why you think that happened that you seemed to take the

Page 101

brunt of it?
A Well, what my mom has told me was like my dad hated me. He didn't want me or something like that.
Q If I understand your testimony correctly, you were the youngest child?
A Yes.
Q And the next child in order would have been about two years older than you?
A Yes.
Q So your mom told you that your father didn't want you as a child? That he was I guess surprised by your conception?
A He knew -- I guess well -- as far as I know, when my mom got pregnant, he wanted it but then once I started growing up, the terrible two's and whatnot what kids do, he didn't like it.
Q So it wasn't that he was angry that you were conceived. He didn't develop sort of dislike towards you until after you were born and started growing up and became a handful?
A Yes.
Q Did she ever indicate anything else to you as to why she felt that your father didn't particularly care for you?
A She said that my dad told her that I had the

DA-DAZE-NOM MANZANARES - 06/26/07

Page 102

1  attitude of his sister, Lucille, and he didn't like it
2  which I thought I didn't have no attitude of her.
3      Q    All right.  Let's go through -- you gave me
4  your mother's family.
5          Tell me about your father's family.  Are your
6  father's parents alive?
7      A    No.
8      Q    Did you ever know them?
9      A    Yes.
10     Q    What were their names?
11     A    His father was Joe Manzanares.
12     Q    Okay.
13         And the mother?
14     A    Margaret Garcia.
15     Q    And did either of them live in Owyhee?
16     A    No.
17     Q    So you had met them, but you didn't spend any
18 significant time with them; is that right?
19     A    Every now and then during the summers, me and
20 my brother would go up there and visit them in Salt
21 Lake.
22     Q    How about your father, did he have siblings?
23     A    Yes.
24     Q    How many?
25     A    A lot.

Page 103

1      Q    Can you give me your best estimate of how
2  many?
3      A    I would say about eight or nine.
4      Q    Of those eight or nine, how many of them did
5  you come to know in any way?
6      A    All of them except for two.
7      Q    And did they live in Owyhee for the most
8  part?
9      A    No.  They all lived in Salt Lake except for
10 -- two of them don't live in Salt Lake.  One lives in
11 New Mexico, and the other one lives in Arizona.
12     Q    When you moved for the period of time to Salt
13 Lake City, who did you live with there?
14     A    Lucille.
15     Q    And was Lucille your brother's sister?
16     A    No, that was my Dad's sister?
17     Q    Your brother's sister would also be your
18 sister, right?
19     A    Yeah.
20     Q    Okay.
21         Your Dad's sister, Lucille, and that's who
22 you went there to live with?
23     A    Yes.
24     Q    And I'm sorry to ask these questions.  I know
25 they're going to be hard, but they are important to

Page 104

1  us.
2          When you learned that these three grandnieces
3  of your mother were going to come to live with you,
4  were you concerned about their well-being, in light of
5  what you had been living through yourself?
6      A    Yes, I was.
7      Q    Did you ever do anything to try to voice your
8  concern to anyone that you felt those children might
9  be coming into an environment that could be harmful to
10 them?
11     A    No.
12     Q    Did it bother you and concern you that that
13 was going to occur?
14     A    It did.  You know, several times I did try to
15 stick up for them when they did get hit but I just got
16 it worse.
17     Q    So you kind of were in a terrible situation.
18 To protect them, he took it out on you?
19     A    Yes.
20     Q    Did you ever feel guilty about the fact that
21 they were getting abused as well, that you didn't do
22 more to try to stop that from occurring or to stop
23 them from coming to live in your home?
24     A    Somewhat, yes.
25     Q    How long are they living in your home before

Page 105

1  the one child is fatally injured?
2      A    Less than a year.
3      Q    And were you living in the home at the time
4  that the child suffered the injury that caused its
5  death?
6      A    Yes.
7      Q    What do you recall about that incident?
8      A    Prior to her death, she was complaining of a
9  lot of stomach pains.  She would vomit up blood, and
10 her bowel movements were bloody.  She was very
11 dehydrated.  She got very skinny.
12         Before that, maybe three days before that, my
13 dad used to hit her right in the spleen area, the
14 stomach, because he thought that if you hit somebody
15 there, there's no bruise.  So that's why he did that.
16 He didn't want to show the social worker or the case
17 workers any kind of bruises or anything on those
18 little girls.
19         But after that, then she started showing a
20 lot of signs that she was really badly hurt.  My mom
21 did offer to take her to the emergency room there in
22 Owyhee, but my dad told her "No," that she would be
23 okay.
24     Q    Did your father hit you in the stomach the
25 same way?

DA-DAZE-NOM MANZANARES - 06/26/07

28 (Pages 106 to 109)

Page 106

1    A    Yes, he did.
2    Q    Did that start after the incident that you
3  had described before where you had a black eye and the
4  authorities were called and some form of an
5  investigation was done?
6         At that point in time, did he start hitting
7  you more in the stomach evidencing his belief that if
8  he hit in you in the stomach, that there wouldn't be
9  signs of this?
10   A    No.
11        Several times he did hit me in the stomach
12 but other than that, he just hit me wherever he could
13 but except for the facial area.
14   Q    As far as those three siblings were
15 concerned, was there one of them that got singled out
16 more than the others?
17   A    Meaning like hit more?
18   Q    Yes.
19   A    Yes.
20   Q    And was it the one that ultimately passed
21 away?
22   A    Yes.
23   Q    And what was that child's name?
24   A    Brittani.
25   Q    So several days before Brittani passed away,

Page 107

1  you started seeing some real severe signs of problems,
2  bleeding in her vomit and in her stool and things like
3  that?
4    A    Yes.  I used to take her a bath, and I would
5  see that.
6    Q    Did you know right away the reason why she
7  was suffering those problems?
8    A    Yes, I did.
9    Q    Did you ever do anything to report it to
10 anyone?
11   A    No.  I was afraid of my dad.
12   Q    Did you, at any time after this incident,
13 ever feel guilty for not reporting it sooner to some
14 outside person?
15   A    Yes.
16   Q    And I assume that that weighed pretty heavily
17 on you for a long time?
18   A    Yes.  To this day, it still does.  I just try
19 to push it to the back of my mind.
20   Q    I understand and again, I apologize for
21 asking these questions.
22        So it's at some point in time around the
23 death of this child that you then get sent to live
24 with your brother to Salt Lake City to stay with
25 Lucille; is that correct?

Page 108

1    A    Yes.
2    Q    And is your father arrested, as a result of
3  that incident, before you're sent off to Salt Lake
4  City?
5    A    No.
6    Q    So you get sent off first and then he gets
7  arrested?
8    A    After we come back, yes, he does.
9         In between the time that we were in Salt Lake
10 and in between when they were in Owyhee, my parents,
11 he didn't get arrested but after we came back about I
12 think it was 2000, then he got arrested.
13   Q    All right.
14        Once the little girl died.
15   Q    Where did the little girl pass away?
16   A    In our house in Owyhee at the new house.
17   Q    Do you remember how that came about?  In
18 other words, how she passed away?
19   A    It was due to a ruptured spleen.
20   Q    I kind of assumed that from your previous
21 testimony.
22        What I'm more interested in and again, I
23 apologize for the question, where was she within the
24 home when she passed away?
25   A    In the kitchen area.

Page 109

1    Q    Did she just collapse or something?
2    A    No.  My dad told her to sleep in there.
3    Q    In the kitchen?
4    A    Uh-huh.
5    Q    Is that a "Yes?"
6    A    Yes.
7    Q    And do you know why he did that?
8    A    To be an asshole.
9    Q    Just to be mean?
10   A    Yes.
11   Q    And so where was she sleeping when you say
12 she was sleeping in the kitchen?
13   A    She was -- we have like -- there's the dining
14 room and then there's like a small room for like the
15 junk room, it's no bigger than -- it's not really big,
16 it's like a closet area.  She was laying right there
17 on the side of the wall.
18   Q    In that little closet room?
19   A    No. Halfway from the closet door and then
20 part of the dining room area, that's where she was at.
21 She was on like a thin -- not really a mattress, it's
22 like foam stuff.
23   Q    A foam pad or something?
24   A    Yes.
25   Q    And she was sleeping there?

DA-DAZE-NOM MANZANARES - 06/26/07

## Page 110

1  A  Yes, that's where at. She was sleeping
2 there.
3  Q  And how long had she been forced to sleep in
4 that area before she passed away?
5  A  Just for that day or that night. Because I
6 checked on her like around midnight because I had to
7 use the restroom. I went in there to check on her,
8 make sure my dad didn't hear me. She was still alive
9 by then because I know I waked her, and I said, "Are
10 you okay?" She said, "Yeah, but I'm thirsty." So I
11 said, "Let me go give you some water."
12      So I went into the bathroom pretending I was
13 flushing the toilet and then gave her some water. She
14 drank it, and I said, "Are you okay?" She said,
15 "Yeah," and she just laid back down.
16  Q  Did you have to hide the fact that you were
17 giving her water?
18  A  Yes. We weren't supposed to -- like me and
19 my brother and my mom, we were not supposed to help
20 her out in any way.
21  Q  Okay.
22      And then what, you woke up the next morning
23 and she had passed away in the night?
24  A  Yes.
25  Q  I assume that was very traumatic for you?

## Page 111

1  A  Yes.
2  Q  And how long after that child's death was it
3 that you get sent to live with your aunt?
4  A  About maybe a month later.
5  Q  And did you find the fact that you were being
6 sent to live with your aunt a relief to you that you
7 would not be the victim of his abuse any longer?
8  A  Yes, it was.
9  Q  Did you attend school when you went to Salt
10 Lake City?
11  A  Yes.
12  Q  But you were only there for a couple of
13 months?
14  A  Yes.
15  Q  And then you come back to Owyhee?
16  A  Yes.
17  Q  Why is it that you come back to Owyhee?
18  A  Because my aunt was doing dirty work on the
19 side meaning like she tried to make my mom and dad
20 sign full custody over to her without them knowing it
21 through her Mormon lawyers or whatever.
22      Then he found out what it was because myself
23 and my brother told her why we had to go to the court
24 house and what it was for and stuff like that. Then
25 the following two days my mom and him they came down

## Page 112

1 and picked us up.
2  Q  All right.
3      Were you concerned, when he showed up, that
4 he was going to be angry about the fact that there was
5 a move to try to take you from him?
6  A  Yes.
7  Q  And you were concerned he was going to
8 retaliate against you for that?
9  A  No. He just mostly yelled at his sister and
10 that's it.
11  Q  Okay.
12      You are about 12 or 13, at that point in
13 time?
14  A  I believe so.
15  Q  Did the abuse of you continue after you came
16 back?
17  A  Yes. It stopped for about maybe a month,
18 maybe less than a month.
19  Q  After you came back?
20  A  Yes.
21  Q  And then it started up again?
22  A  Yes.
23  Q  Is that the reason why you and your mom ended
24 up being moved into some shelter?
25  A  Yes.

## Page 113

1  Q  Tell me what happens?
2  A  well, at first when the little girl died, the
3 FBI came in. They started investigating stuff. We
4 were told by my dad, "Don't say anything. Don't tell
5 them that I did it," and stuff like that.
6      So we listened to him because we were scared.
7 Then after that after the FBI guys, he sat down and
8 talked to us and we told him the truth because we
9 weren't going to hide it.
10  Q  You told the FBI guy the truth?
11  A  Yeah, the truth of what happened to the
12 little girl.
13      My dad found out and then when it came to his
14 turn of being interviewed, he told one of the FBI
15 agents that he was going to kill me and then kill
16 himself. So that's why they put him into or put us
17 into the shelter home in Elko.
18  Q  Do you recall how long you stayed there?
19  A  About maybe a month or two months, somewhere
20 around there.
21  Q  And somewhere during that point in time, he
22 then gets arrested; is that correct?
23  A  Yeah. Maybe a week after we were there, he
24 was arrested.
25  Q  And he never -- did he ever get out of jail

**Exhibit "C"**

# WILLIAM E. FOOTE, PH.D.



215 Gold Avenue SW, Suite 202
Albuquerque, NM 87102-3364
Phone: (505) 243-2777
Fax: (505) 243-2776
Date of Birth: November 4, 1946

> NOTE: Professional credentials
> and affiliations are subject to
> frequent revision. While this
> curriculum vitae reflects the
> author's best knowledge as of
> the date of composition, direct
> contact is encouraged

## EDUCATION

| | | | |
|---|---|---|---|
| Ph.D. | 1978 | University of New Mexico | Psychology |
| M.A. | 1974 | University of New Mexico | Psychology |
| B.A. | 1969 | University of New Mexico | Psychology |

## LICENSES

#193 for clinical psychology from the New Mexico Board of Psychologist Examiners, June 1979.

#30 for psychology from the Territory of Nunavut, Arctic Canada

## BOARD CERTIFICATION

Diplomate in Forensic Psychology by the American Board of Professional Psychology, September 1984.

## PROFESSIONAL EXPERIENCE

Present:     Individual private practice in psychology, specializing in forensic applications of clinical and rehabilitation psychology.

Psychological Consultant, Incident Management Group
Ft. Lauderdale, FL

Member, the Forensic Panel

Consultant to Samaritan Counseling Center, Albuquerque

Consultant to Psychological Assessment Resources, Inc, Lutz, Florida

Consultant to the Internship Consortium, UNM Children's Hospital, Albuquerque Veteran's Administration Hospital.

Clinical Assistant Professor, Department of Family and Community

**PROFESSIONAL EXPERIENCE** (contd.)

        Medicine, University of New Mexico, School of Medicine

        Clinical Assistant Professor, Department of Psychiatry, University of New Mexico School of Medicine

        Consultant to the Albuquerque Police Department

2002-2005    Clinical Director, Society of Northern Renewal (A not-for-profit organization dedicated to treating sexually abused Inuit men in Nunavut Territory, Canada)

1998-1999    Consultant to the Forensic Hospital, Las Vegas Medical Center, Las Vegas, New Mexico.

1996-1998    Consultant to Criminal Investigations Division, Albuquerque Police Department, New Mexico State Police Homicide Division.

1984-1998    Regional Medical (Psychology) Consultant, Social Security Administration.

1993, 1998, 2000   Spring Semester; Adjunct Professor, University of New Mexico School of Law, Seminar in Advanced Evidence and Trial Practice (Psychological Evidence).

1989, 1992, 1994   Spring Semester; Adjunct Associate Professor, University of New Mexico Department of Psychology, Psychology and the Law Graduate Seminar.

1979-1991    Diagnostic Consultant--Indian Health Service, Santa Fe, New Mexico, area.

1986-1987    Fall Semester; Instructor, Department of Psychology, University of New Mexico. Graduate Seminar in Professional Ethics and Issues.

1980-1981    Spring Semester; Instructor, Guidance Counseling Department, University of New Mexico.

1977-1981    Clinical Psychologist, New Mexico Division of Vocational Rehabilitation, Psychological Services Unit, Albuquerque, New Mexico.

<div align="center">

William E. Foote, Ph.D.
Curriculum Vitae
Page 2

</div>

| 1976-1977 | Psychology Intern, Atascadero State Hospital. Atascadero, California (An internship approved by the American Psychological Association). |
|---|---|
| 1975-1976 | Psychological Clinician. New Mexico Division of Vocational Rehabilitation project at St. Joseph's Hospital, Albuquerque, New Mexico. |
| 1974-1976 | Group Facilitator. First Offender's Drug Abuse Education Program, Albuquerque, New Mexico. |
| 1974-1975 | Psychological Counselor. Penitentiary of New Mexico, Santa Fe, New Mexico. |
| 1970-1972 | Personnel Psychology Specialist (E-5). United States Army, Armed Forces Entrance and Examining Station, Cincinnati, Ohio. |

## INVITED PRESENTATIONS

PSYCHOLOGICAL EVALUATION AND CONSULTATION IN CLERGY AND TEACHER SEXUAL ABUSE CASES. A workshop for the American Board of Forensic Psychology, Newport RI, April 28, 2007

FORENSIC PSYCHOLOGY: INTRODUCTION. A workshop sponsored by the American Academy of Forensic Psychology, Newport, RI, April 27, 2007.

PSYCHOLOGICAL EVALUATION IN TORT CASES AND WILL CONTESTS. A workshop sponsored by the Louisiana Psychological Association, Baton Rouge, LA, January 20, 2007.

FORENSIC PSYCHOLOGY: INTRODUCTORY AND ADVANCED COURSES. A workshop sponsored by the American Academy of Forensic Psychology, Pittsburgh, PA, November 1-4, 2006

MALINGERING AND DISSIMULATION. A workshop sponsored by the New Mexico Psychological Association, October 20, 2006.

William E. Foote, Ph.D.
Curriculum Vitae
Page 3

## INVITED PRESENTATIONS (cont.)

PSYCHOLOGICAL EVALUATION AND CONSULTATION IN CLERGY AND TEACHER SEXUAL ABUSE CASES. A workshop for the American Board of Forensic Psychology, June 12, 2006

FORENSIC PSYCHOLOGY: INTRODUCTORY AND ADVANCED COURSES. A workshop sponsored by the American Academy of Forensic Psychology. Berkeley, California, January 19-21, 2006.

THE INUIT PROJECT: FORENSIC EVALUATION AND TREATMENT OF A LARGE GROUP OF SEX ABUSE SURVIVORS. University of New Mexico Hospital Psychiatry Grand Rounds October 7, 2005

UNDUE INFLUENCE. A workshop for the New Mexico State Bar Continuing Legal Education bureau, the Elderlaw Seminar, April 1, 2005.

PSYCHOLOGICAL CONSULTATIONS IN TESTAMENTARY COMPETENCE AND UNDUE INFLUENCE CASES. A workshop sponsored by the New Mexico Psychological Association, February 4, 2005.

PSYCHOLOGICAL EVALUATION AND CONSULTATION IN CLERGY AND TEACHER SEXUAL ABUSE CASES. A workshop for the American Board of Forensic Psychology, October 1, 2004.

FORENSIC PSYCHOLOGY: BEYOND THE FUNDAMENTALS. A workshop for the New Mexico Psychological Association. October 15, 2004.

INTRODUCTION TO EVALUATION IN CIVIL CASES. A workshop for the New Mexico Psychological Association. October 16, 2004

FORENSIC PSYCHOLOGY: INTRODUCTORY AND ADVANCED COURSES. A workshop sponsored by the American Academy of Forensic Psychology. Denver, Colorado, October 23-25, 2003.

INTRODUCTION TO CONFIDENTIALITY, PRIVILEGE, CIVIL COMMITMENT AND DUTY TO WARN. Presentation for the Interns of the Consortium at the Veteran's Administration Hospital, Albuquerque, NM., October 22, 2003.

## INVITED PRESENTATIONS (cont.)

FORENSIC PSYCHOLOGY: INTRODUCTORY AND ADVANCED COURSES. A workshop sponsored by the American Academy of Forensic Psychology. Dallas Texas, March 20-23, 2003.

FORENSIC PSYCHOLOGY: INTRODUCTORY AND ADVANCED COURSES. A workshop sponsored by the American Academy of Forensic Psychology. Minneapolis, Minn., October 2-5, 2002.

INTRODUCTION TO CONFIDENTIALITY, PRIVILEGE, CIVIL COMMITMENT AND DUTY TO WARN. Presentation for the Interns of the Consortium at the Veteran's Administration Hospital, Albuquerque, NM., September 25, 2002.

FORENSIC PSYCHOLOGY: INTRODUCTORY AND ADVANCED COURSES. A workshop sponsored by the American Academy of Forensic Psychology. Atlanta, Georgia, April 18-21, 2002.

PSYCHOLOGICAL EVALUATION IN SEXUAL HARASSMENT CASES. Workshop presented for the American Academy of Forensic Psychology, New Orleans, Louisiana, January 14, 2002

POSTTRAUMATIC STRESS DISORDER–MALINGERING AND OTHER ISSUES. A presentation to the New Mexico Worker's Compensation Administration, December 14, 2001.

FORENSIC PSYCHOLOGY: INTRODUCTORY AND ADVANCED COURSES. A workshop sponsored by the American Academy of Forensic Psychology. Seattle, Washington, October 18-21, 2001.

FORENSIC PSYCHOLOGY: INTRODUCTORY AND ADVANCED COURSES. A workshop sponsored by the American Academy of Forensic Psychology. St. Louis, Missouri, April 24-29, 2001.

POSTTRAUMATIC STRESS DISORDER AND THE COURTS: RECENT ADVANCES. A presentation to the New Mexico Workers' Compensation Association. Albuquerque, New Mexico, April 13, 2001.

ASSESSING VIOLENCE POTENTIAL. Presentation to Veterans Administration Interns. Albuquerque, New Mexico, April 11, 2001.

WORKPLACE VIOLENCE AND DIRECT THREAT: AN APPROACH FOR PREVENTION, INTERVENTION AND SAFETY. A presentation for Human Relations professionals.

Albuquerque, New Mexico, June 27, 2000.

FORENSIC PSYCHOLOGY: INTRODUCTORY AND ADVANCED COURSES. A workshop sponsored by the American Academy of Forensic Psychology. Tampa, Florida, September 13-17, 2000.

EMPLOYMENT DISCRIMINATION CASES: INTRODUCTION TO EVALUATION AND CONSULTATION. A workshop sponsored by the American Academy of Forensic Psychology. San Juan, Puerto Rico, June 9, 2000.

INTRODUCTION TO APPLICATIONS OF FORENSIC PSYCHOLOGY IN CRIMINAL CASES. A workshop sponsored by the American Academy of Forensic Psychology. San Juan, Puerto Rico, June 8, 2000.

EMPLOYMENT DISCRIMINATION: INTRODUCTION TO SEXUAL HARASSMENT AND THE ADA. A workshop presented and sponsored by the American Psychological Association. On board the Ocean Princess, April 1, 2000.

RISK FACTORS FOR VIOLENCE AND AGGRESSION AMONG YOUTH. Presentation for the Staff of Albuquerque Public Schools. Albuquerque, New Mexico, March 15, 2000.

PSYCHOLOGICAL CONSULTATIONS IN AMERICANS WITH DISABILITIES ACT CASES. A workshop presented and sponsored by the American Academy of Forensic Psychology. New Orleans, Louisiana, March 10, 2000.

FORENSIC PSYCHOLOGY: INTRODUCTORY AND ADVANCED COURSES. A workshop sponsored by the American Academy of Forensic Psychology. San Diego, California, February 17-20, 2000.

POST-CONVICTION RELIEF: COMPETENCY ISSUES IN CAPITAL CASES. Joint American Psychological Association/American Bar Association Conference on Psychological Expertise and Criminal Justice. (Session Chair and Conference Chair). Washington, DC, October 14-17, 1999.

INTENSIVE FORENSIC PRACTICE WORKSHOP: VIOLENCE ASSESSMENT; PRESENTATIONS ON: ASSESSMENT OF VIOLENCE POTENTIAL, TESTAMENTARY CAPACITY AND UNDUE INFLUENCE; PSYCHOLOGICAL CONSULTATION IN RACE DISCRIMINATION CASES; PSYCHOLOGICAL CONSULTATION IN EMPLOYMENT DISCRIMINATION CASES. A workshop sponsored by the American Academy of Forensic Psychology. Washington, DC,

September 30–October 3, 1999.

BEREAVEMENT, GUILT AND GETTING WHAT'S MINE: COMMON EMOTIONAL REACTIONS WHICH APPEAR ABOUT THE TIME THE WILL IS READ. The Probate Institute sponsored by the New Mexico Bar Association, September 10, 1999.

THE PSYCHOLOGY OF CHILD SEXUAL ABUSE: SUGGESTIBILITY AND SYMPTOMS. A workshop sponsored by the New Mexico Defense Lawyers Association. Albuquerque, New Mexico, July 7, 1999.

THE PSYCHOLOGY OF SCHOOL VIOLENCE: FOCUS ON PREVENTION. Presentation for the City of Albuquerque and Albuquerque Public Schools convocation on school violence. Albuquerque, New Mexico, June 29, 1999.

PREDICTION OF VIOLENT BEHAVIOR IN CLINICAL SETTINGS. A workshop sponsored by the New Mexico Psychological Association. Albuquerque, New Mexico, May 21, 1999.

INTRODUCTION TO FORENSIC EVALUATION IN EMPLOYMENT DISCRIMINATION CASES. A workshop sponsored by the American Academy of Forensic Psychology. Austin, Texas, February 6, 1999.

WORKPLACE DISCRIMINATION: AN INTRODUCTION TO LAW, RESEARCH, AND PSYCHOLOGICAL EVALUATIONS. Part of the American Board of Professional Psychology Summer Institute. Portland, Oregon, June 18, 19, 20, 1998.

GRIEF FOLLOWING VIOLENT DEATH. Part of *The Many Faces of Death* Conference. Albuquerque, New Mexico, April 25, 1998.

INTRODUCTION TO FORENSIC CRIMINAL EVALUATION. Wyoming Psychological Association Workshop. Saratoga Springs, Wyoming, September 27 & 28, 1997.

CONFIDENTIALITY, LEGAL ISSUES AND ETHICS IN COUNSELING PROBLEM GAMBLERS AND THEIR FAMILIES. 1ST Annual Compulsive Gambling Symposium: Understanding and Treating the Problem Gambler. Albuquerque, New Mexico, August 27, 1997.

RESOLVING INTERDISCIPLINARY DISPUTES: WHY CAN'T WE JUST GET ALONG? American Bar Association/American Psychological Association Family Law Conference. Los Angeles, California, April 19, 1997.

STALKING AND RAPE: OFFENDER PATTERNS AND IMPACT UPON VICTIMS. Female & Safe Symposium. Albuquerque, New Mexico, March 4, 1997.

THE ROLE OF PSYCHOLOGISTS IN EMPLOYMENT DISCRIMINATION CASES. A workshop sponsored by the American Academy of Forensic Psychology. Kansas City, Missouri, March 2, 1997.

EMERGING ISSUES IN PUBLIC ACCESS TO TEST RECORDS. Invited Address to the Association of Test Publishers. New York, New York, August 14, 1995.

THE ROLE OF PSYCHOLOGISTS IN EMPLOYMENT DISCRIMINATION CASES (with Jane Goodman-Delahunty). A workshop sponsored by the American Academy of Forensic Psychology. Philadelphia, Pennsylvania, April 27, 1995; Seattle, Washington, January 18, 1996.

PSYCHOLOGICAL ISSUES IN CLIENT/ATTORNEY COMMUNICATION (with William Carpenter, J.D.). New Mexico Bar Association Meeting: 1994 New Mexico Practice Skills Course. October 12, 1994; November 18, 1995.

PSYCHOLOGICAL EVALUATION OF RESPONDENTS IN DISCIPLINARY CASES. Invited presentation to the National Organization of Bar Counsel, at the meeting of the American Bar Association. New Orleans, Louisiana, August 5, 1994.

DOMESTIC VIOLENCE. Workshop for New Mexico Public Defenders Department. Albuquerque, New Mexico, July 12, 1994.

EVALUATION OF ALLEGED VICTIMS OF CHILD ABUSE: THE CURRENT RESEARCH. Workshop for Mental Health personnel, sponsored by Mesilla Valley Hospital. July 11, 1994.

PSYCHOLOGICAL EVALUATION IN SEX ABUSE CASES: THE ALLEGED PERPETRATOR. Workshop for Lawyers, New Mexico Bar Association. Albuquerque, New Mexico, June 4, 1994.

NEW MEXICO MENTAL HEALTH LAW WORKSHOP FOR PSYCHOLOGISTS. Albuquerque, New Mexico, May 20, 1994.

PSYCHOLOGICAL DISABILITY IN SOCIAL SECURITY: REAL, IMAGINED, MALINGERED. Workshop for Social Security Administrative Law Judges. Albuquerque, New Mexico,

April 16 and 17, 1994.

THE "HOW TO'S" OF CLIENT/ATTORNEY COMMUNICATION (with Julianne Lockwood, Ph.D.). New Mexico Bar Association workshop "New Mexico Practice Skills Course." November 19, 1993.

MENTAL ISSUES IN CRIMINAL DEFENSE (with Barbara Bergman). Workshop for the National Legal Aid and Defender Association. November 12, 1993.

SECRETS OF EFFECTIVE CROSS EXAMINATION OF THE PSYCHOLOGICAL EXPERT - THE QUESTIONS THE EXPERTS HATE MOST . . . (with Frank Spring, J.D., Ph.D.). Presentation for the New Mexico Trial Lawyer's Association. November 5, 1993.

PSYCHOLOGICAL EVIDENCE IN THE POST-DAUBERT/ALBERICO ERA. Workshop for the New Mexico Public Defender Department. September 30, 1993.

ETHICAL AND LEGAL ISSUES IN PROFESSIONAL PRACTICE. Workshop for staff of Lea County Guidance Center. Hobbs, New Mexico, August 4, 1993.

PROFESSIONAL AND ETHICAL ISSUES IN FORENSIC ASSESSMENT. Panel presentation as part of the Southwest Conference of the Law and Psychology. February 6, 1993.

THE PSYCHOLOGICAL IMPACT OF RAPE UPON THE VICTIM. A presentation presented as part of: "Privacy vs. the Public's Right to Know - First Amendment Issues." Panel for the New Mexico Bar Association and New Mexico Press Association. Albuquerque, New Mexico, January 23, 1993.

SEXUAL MISCONDUCT AND THE LAW: THE MANDATE FOR A CRIMINAL STATUTE. Psychiatry Grand Rounds presentation. December 19, 1992.

THE ASSESSMENT OF DANGEROUSNESS IN A PROBATION/PAROLE POPULATION. Inservice training for New Mexico Probation and Parole officers. University of New Mexico School of Nursing, June 10, 1992.

THE ASSESSMENT OF MALINGERING. Workshop for the Bernalillo County Forensic Evaluation Team. April 15, 1992

MALPRACTICE FROM PATIENT SUICIDE/HOMICIDE: RISK MANAGEMENT AND CASE CONSULTATION. Workshop for The American Academy of Forensic Psychology.

William E. Foote, Ph.D.
Curriculum Vitae
Page 9

February 27, 1992.

COMPETENCY TO WAIVE RIGHT TO SILENCE AND COUNSEL.  Seminar for University of New Mexico School of Law.  February 18, 1992.

PSYCHOLOGISTS IN THE COURTROOM: A SURVIVOR'S MANUAL.  Workshop for psychologists and students sponsored by Francis Marion College.  Florence, South Carolina, October 25, 1991.

MADNESS AND MURDER-VIOLENT BEHAVIOR A MENTAL ILLNESS.  Public program for Francis Marion College.  Florence, South Carolina, October 24, 1991.

WORKING WITH PSYCHOLOGISTS IN CIVIL CASES.  Workshop for Paralegal sponsored by the New Mexico Trial Lawyer's Association.  October 15, 1991.

THE USE OF PSYCHOLOGISTS IN CRIMINAL CASES.  Half-day workshop for the New Mexico Public Defender's Office.  September 12, 1991.

SUICIDE PREDICTION AND INTERVENTION-IMPACT OF DRUG ABUSE; ISSUES WITH ADOLESCENTS.  Inservice for staff of Heights Psychiatric Hospital.  May 1, 1991.

SUICIDE PREDICTION AND INTERVENTION-USE OF DEMOGRAPHICS, HISTORICAL AND CLINICAL FACTORS WITH ADULTS.  Inservice for staff of Heights Psychiatric Hospital.  April 10, 1991.

ADVANCES IN THE RORSCHACH.  Workshop for IHS psychologists.  Santa Fe, New Mexico, October 4, 1990; December 13, 1990.

SEX, LIES & VIDEOTAPES: ISSUES OF FALSE ALLEGATIONS AND FORENSIC ASSESSMENTS.  Workshop for Mesilla Valley Hospital.  Albuquerque, New Mexico, September 10, 1990.

OFFENDER PSYCHOLOGY AND RECIDIVISM.  Workshop for the New Mexico District Attorney's Association.  Angel Fire, New Mexico, August 8, 1990.

WHAT IS PSYCHOLOGY?  Presentation to Mitchell Elementary School "Career Day."  Albuquerque, New Mexico, May 1, 1990.

THE SLOTHFUL PSYCHOLOGIST'S GUIDE TO SPECIFIC INTENT.  Workshop for the Bernalillo County Forensic Evaluation Team.  April 9, 1990.

William E. Foote, Ph.D.
Curriculum Vitae
Page 10

CIVIL COMMITMENT UNDER NEW MEXICO'S NEW CIVIL COMMITMENT STATUTE. New Mexico Psychological Association Annual Meeting. April 7, 1990.

PSYCHOLOGISTS RESPONSE TO NATURAL DISASTER: THE NEW MEXICO EXPERIENCE. American Psychological Association State Leadership Conference. Washington, DC, March 4, 1990.

THE PSYCHOLOGIST AS AN EXPERT WITNESS. Workshop for the New Mexico Trial Lawyers Association. January 19, 1990.

MADNESS AND MURDER. Presentation to the Medical Staff of Santa Fe Indian Hospital. Santa Fe, New Mexico, April 1989.

HOMICIDE AND MENTAL ILLNESS. Presentation to the Staff of Presbyterian Hospital. Albuquerque, New Mexico, March 1989.

CHILD AND ADOLESCENT SUICIDE: MORE QUESTIONS THAN ANSWERS. Presentation to Survivors of Suicide. March 1989.

PARAMETERS OF PSYCHOLOGICAL EXPERTISE IN FORENSIC SETTINGS. Workshop for psychologists and lawyers. September 1988.

ALCOHOL AND CRIME: PREDICTION AND PREVENTION. Inservice training for Presbyterian Northside Treatment Center Staff. Albuquerque, New Mexico, May 1988.

MENTAL HEALTH AND THE LAW IN NEW MEXICO: THE EFFECT UPON PSYCHOLOGICAL PRACTICE. Discussion for psychologists. November 15, 1987.

NEW CONCEPTS IN PSYCHOPATHY. Discussion for Albuquerque Police Department sex crimes detectives. Albuquerque, New Mexico, May 21, 1987.

PERVERTS ON THE PHONE: THE PSYCHOLOGY OF PERVERSION IN A "HOTLINE" POPULATION. Albuquerque Contact. Albuquerque, New Mexico, April 23, 1987.

DUTY TO WARN: THE PERILS OF PRACTICE TEN YEARS AFTER TARASOFF. Grand Rounds for Charter Hospital of Albuquerque. Albuquerque, New Mexico, May 2, 1987.

THE PSYCHOLOGICAL EVALUATION OF SEX OFFENDERS. Presentation at Conference on

William E. Foote, Ph.D.
Curriculum Vitae
Page 11

the Sexual Abuse of Children sponsored by the New Mexico Department of Health and Social Services and University of New Mexico Psychology Department. Albuquerque, New Mexico, March 1986.

THE VOCATIONAL CONSEQUENCES OF PSYCHIC AND PHYSICAL INJURIES. Workshop in Tucson, Arizona, March 1986.

ADVANCED ASSESSMENT TUTORIAL. For students and faculty of the Psychology Department, University of New Mexico. Albuquerque, New Mexico, November 1985-May 1986.

PSYCHOLOGICAL ETHICS: A NEW LOOK AT AN OLD PROBLEM. New Mexico Psychological Association Workshop. February 1986.

PSYCHOPATHOLOGY IN PRISON POPULATIONS. Training conducted for correctional officers from the Penitentiary of New Mexico. August 1985.

DEPRESSION AND SUICIDE: DIAGNOSIS AND TREATMENT. Workshop for mental health and hospital staff, Santa Fe Indian Hospital. Santa Fe, New Mexico, January 1985.

PSYCHOLOGICAL OVERLAY IN LOW BACK INJURIES: RECENT RESEARCH AND CURRENT PERSPECTIVES. Continuing education for Vista Sandia Hospital. August 1984.

THE PSYCHOLOGY OF PERSUASION. (For lawyers) Sponsored by New Mexico Trial Lawyers Association. June 1983.

POST-TRAUMATIC STRESS SYNDROME. (For lawyers and psychologists) Sponsored by the New Mexico Trial Lawyers Association and the New Mexico Psychological Association (NMPA). February 1982.

THE NEUROPSYCHOLOGY OF ALCOHOLISM. (For the medical staff) Sponsored by the Santa Fe Indian Hospital. Santa Fe, New Mexico, July and August 1981.

TRAUMATIC NEUROSIS AND PHYSICAL INJURY. For physicians of the Santa Fe Indian Hospital. Santa Fe, New Mexico, June 1981.

INTRODUCTION FOR THE COMPREHENSIVE SYSTEM FOR THE RORSCHACH. (For psychologists) Sponsored by the New Mexico Division of Vocational Rehabilitation.

William E. Foote, Ph.D.
Curriculum Vitae
Page 12

Albuquerque, New Mexico, February 1981.

NEUROPSYCHOLOGY AND VOCATIONAL REHABILITATION.  Sponsored by New Mexico Division of Vocational Rehabilitation.  Albuquerque, New Mexico, January, 1981.

COPING WITH ON-THE-JOB STRESS.  Sponsored by New Mexico Division of Vocational Rehabilitation Continuing Education.  January 1979.

EVALUACION PSICOLOGICO DE NIÑOS: ASPECTOS INTELLECTUALES.  Sponsored by New Mexico Division of Vocational Rehabilitation and Partners of the Americas.  Albuquerque, New Mexico, December 1978.

DESAROLLO NORMAL Y ABNORMAL DE NIÑOS.  Sponsored by New Mexico Division of Vocational Rehabilitation and Partners of the Americas.  Morelia, New Mexico, September 1978.

ASSERTIVENESS IN THE OFFICE.  Sponsored by New Mexico Division of Vocational Rehabilitation Continuing Education.  July 1978.

REHABILITATION OF THE PSYCHOSOCIALLY DISABLED CLIENT.  Sponsored by the Arkansas Rehabilitation Continuing Education Program.  Monroe, Louisiana, February 1978; Baton Rouge, Louisiana, March 1978; Hot Springs, Arkansas, April 1978.

## PAPERS

*Sexual Harassment: What the Forensic Psychologist needs to know from social scientists.*  Paper presented at the Annual Meeting of the Society of Organizational and Industrial Psychologists.  April 16, 2005.

*Informed Consent for Forensic Psychological Evaluation:  Rethinking the Roles of the Psychologist and the Lawyer.*  Paper presented at the Annual Meeting of the American Psychology-Law Society.  April 5, 2005 [Dr. Foote was unable to attend this conference because of an injury.  Paper was presented by Dan Shuman.]

*The Inuit Project: Forensic Evaluation of a Large Group of Sex Abuse Survivors*, American Psychological Association Annual Meeting, Chicago, Ill., August 23, 2002.

*MMPI Stability within and across forensic settings.* (Discussant) American Psychological Association Annual Convention, San Francisco, August 26, 2001.

## PAPERS

*Ten rules for effective psychologist-lawyer interactions.*  American Psychological Association Annual Convention, San Francisco, August 25, 2001.

*Running over a Broken Leg: Psychological Damages in Psychotherapist Sexual Misconduct Cases.* Paper presented at the American Psychological Association Annual Meeting, Washington, DC, August 7, 2000.

*Law, Psychology and Violence in the Workplace.*  Chair of symposium as part of the Presidential Miniconvention at the Annual Meeting of the American Psychological Association, Washington, DC, August 6, 2000.

*Prior Trauma and Sexual Harassment: You Gotta Check it Out.  Law, Psychology and Gender in the Workplace.*  Paper read at symposium as part of the Presidential Miniconvention at the Annual Meeting of the American Psychological Association, Washington, DC, August 5, 2000.
*Daubert as Gatekeeper–Attempts to Quantify Enjoyment of Life.  My paper: Damages–Issues on Reliability and Prejudice.*  Symposium at American Psychological Association Annual Meeting, Boston, Massachusetts, August 1999.

*Competency to Stand Trial–MacArthur Foundation Research and Neuropsychology.* (Chair) American Psychological Association Annual Meeting, Boston, Massachusetts, August, 1999.

*SPPAs Versus Their Regulatory Boards–An Essential New Advocacy Role.*  (Discussant). American Psychological Association Annual Meeting, Boston, Massachusetts, August 1999.

*Americans with Disabilities Act and Psychological and Psychiatric Disabilities*, My presentation: *Psychological Evaluation and the ADA: Between Qualification and Disability.*  Symposium presentation, American Psychological Association 106th Annual Convention, San Francisco, California, August 18, 1998.

*Discussion:  American Psychological Association and the Amicus Process,* My presentation: *COLI's Perspective.*  Paper presented at American Psychological Association 106th Annual Convention, San Francisco, California, August 15, 1998.

*Addictions and Family Law.*  Symposium presentation, American Psychological Association 106th Annual Convention, San Francisco, California, August 14, 1998.

William E. Foote, Ph.D.
Curriculum Vitae
Page 14

## PAPERS

*Immodest Proposal: Should Treating Professionals be Banned From the Courtroom?* Symposium presentation, Psychology-Law Society Bi-Annual Meeting, Redondo Beach, California, March 7, 1998.

*Coping with Patient Suicide or Homicide.* Paper presented at the Annual Meeting of the American Psychological Association, August 16, 1997.

*Reacting to Attorneys in Distress.* Discussion as part of Symposium at the Annual Meeting of the American Psychological Association, August 16, 1997.

*Practical Advice to Practitioners on Privileged Communications.* Symposium presentation, American Psychological Association Convention, Toronto, Canada, August 10, 1996.

*Clinicians' Interests in Maintaining Test Confidentiality.* Symposium presentation, American Psychological Association Convention, New York, New York, August 14, 1995.

*Male Victims of Clergy Abuse: A Preliminary Assessment.* Paper presented at the CHASTEN Conference on Clergy and Therapist Sexual Abuse, Toronto, Canada, October 14, 1994.

*Criminalization in New Mexico.* Paper presented as part of a symposium at American Psychological Association meeting, Los Angeles, California, August 15, 1994.

*Therapy and Testimony: A Dual Relationship?* Paper presented at American Psychological Association, Los Angeles, California, August 14, 1994.

*How Do Rural Practitioners Practice?* Paper presented as part of American Psychological Association Practice Directorate Miniconvention: Rural Practice: New Opportunities for Interdisciplinary Collaboration. American Psychological Association Annual Convention, Toronto, Canada, August 22, 1993.

*Psychological Evaluation in a Case of Double Filicide.* Society for Personality Assessment Annual Meeting, March 18, 1993.

Symposium chair: *Sexual Misconduct Malpractice-Standard of Care, Proximate Cause and Damages, My presentation: Determining the Long-term Impact of Sexual Misconduct on Psychotherapy Patients.* Presented at American Psychological Association Annual Conference, Washington, DC, August 1992.

*An Interdisciplinary Study of Cultural Bias: Hospitalization of a Blackfoot Indian, 1882-1914.*

American Psychological Association Meeting, Washington, DC, August 1986.

*The Role of the Forensic Psychologist in Wrongful Discharge Cases.* Paper presented for the American Board of Forensic Psychology, American Psychological Association Meeting, Los Angeles, California, August 1985.

*Disability evaluation with Hispanic Clients in North America.* Delivered at the XX Inter-American Congress of Psychology in Caracas, Venezuela, July 1985.

*The Psychological Aspect of the Inconsistent Personality Defense.* The International Conference for Psychology and Law, Swansea, Wales, United Kingdom, July 1982.

*The Emotional Responses of Psychopaths and Non-psychopaths to Contradictory Communications.* Rocky Mountain Psychological Association, April 1982.

*A Daily Alternation Procedure for Altering Sexual Arousal in a Pedophile.* The Ghost Ranch Conference on Behavior Therapy, November 1979.

*Transfer of a Discrimination Along a Drug Stimulus Continuum.* Southwest Psychological Association, May 1974.

*Discrimination of Temporally-related Stimuli of Delta-9 THC in Monkeys.* Rocky Mountain Psychological Association, May 1973.

*Effects of Delay of Reinforcement and Post-reinforcement Interval on Response Duration Differentiation.* Rocky Mountain Psychological Association, May 1970.

## PUBLICATIONS (Asterisk denotes peer reviewed)

Foote, W.E. (2007, in press) Fitness for Duty Evaluations. In: Cutler, B. (ed) *The Encyclopedia of Psychology and the Law.* Thousand Oaks, CA: Sage Publications.

Foote, W.E. (2007, in press) Disparate Treatment and Disparate Impact Evaluations. In: Cutler, B. (ed) *The Encyclopedia of Psychology and the Law.* Thousand Oaks, CA: Sage Publications.

Foote, W.E. (2007, in press) The Americans with Disabilities Act (ADA) In: Cutler, B. (ed) *The Encyclopedia of Psychology and the Law.* Thousand Oaks, CA: Sage

Publications.

Foote, W.E. (2007, in press) Evaluations of Individuals for Disability in Insurance and Social Security Contexts. In Rebecca Jackson (ed) *Learning Forensic Psychology*, Mahwah, NJ: Lawrence Erlbaum Associates.

*Foote, W.E. & Shuman, D. W. (2006) Consent for forensic psychological evaluation: rethinking the roles of psychologist and lawyer. *Professional Psychology: Research & Practice 37* (3)

Foote, W.E. (2006). Psychological evaluation and testimony in cases of clergy and teacher sex abuse. In: Alan M. Goldstein (Ed.) *Forensic Psychology: Advanced Topics for Forensic Mental Experts & Attorneys*. Hoboken, NJ: John Wiley & Sons

Foote, W. E. (2006). Ten Rules: How to Get Along Better with Lawyers and the Legal System. In S. N. Sparta and G. P. Koocher (Eds), *Forensic Assessment of Children and Adolescents: Issues and Applications*. Oxford, United Kingdom: Oxford University Press

*Foote, W.E. & Goodman-Delahunty, J. (2005). *Evaluating Sexual Harassment: Psychological, Social, and Legal Considerations in Forensic Examinations.* Washington, DC: American Psychological Association Press.

Foote, W. E. (2003). Forensic Evaluation in Americans with Disabilities Act Cases. In A. D. Goldstein and I. B. Weiner (Eds), *Comprehensive Handbook of Forensic Psychology, Volume Eleven: Forensic Psychology.* New York: John Wiley & Sons, Ltd.

*Foote, W. E. (2002). The Clinical Assessment of People With Disabilities. In E. Ekstrom and J. Smith (Eds), *Individuals with Disabilities in Educational, Employment and Counseling Settings.* Washington, D.C.: American Psychological Association Press.

*Foote, W. E. (2000). A Model for Psychological Consultation in Cases Involving the Americans with Disabilities Act. *Professional Psychology: Research and Practice, 31*(2), 190-196.

*Foote, W. E. (2000). Commentary on "The Mental State at the Time of the Offense Measure": Should We Ever Screen for Insanity? *Journal of the American Academy of Psychiatry and the Law, 28*(1), 33-37.

*Shuman, D. & Foote, W. E. (2000). *Jaffee v. Redmond's* Impact: Life After the

## PUBLICATIONS (contd.)

Supreme Court's Recognition of a Psychotherapist-Patient Privilege. *Professional Psychology, 30* (5), 479-487.

Foote, W. E. (1999). (Book Review) Fatal Families: The Dynamics of Intrafamilial Homicide by Charles Ewing. *Journal of Psychiatry and Law, 27*, 729-730.

*Foote, W. E. & Goodman-Delahunty, J. (1999). Same-Sex Harassment: Implications of the *Oncale* Decision for Forensic Evaluation of Plaintiffs. *Behavioral Sciences and the Law 17*, 123-139

Foote, W. E. (1998). Police Assisted Suicide Probed. *The Forensic Echo, II*(8), 23.

Foote, W. E. (1998). Abused: Can You Tell? Testimony on Sex Abuse Victims Challenged. *The Forensic Echo, II*(7), 5-6.

Foote, W. E. (1998). Faking Intellectual Problems After Whiplash. *The Forensic Echo, II*(7), 28-29.

*Shuman, D. W., Greenberg, S., Heilbrun, K., and Foote, W. E. (1998). An Immodest Proposal: Is It Time to Bar Treating Mental Health Professionals From the Courtroom? *Behavioral Sciences and the Law, 16*, 509-523.

Foote, W. E. (1997). So Why Don't You Visit? Court Helps Daughter Overcome Stepfather's Block. *The Forensic Echo, I*(11), 21-22.

Foote, W. E. (1997). Police Can Be Incited to Violence: Profanity to Cop Are Fighting Words. *The Forensic Echo, I*(11), 21-22.

Foote, W. E. (1997). History of Pill Overdose Means Adios Amego: Therapist's Suicide Method Danger to Vulnerable Clients. *The Forensic Psychiatry Echo,* August, 5-7.

Foote, W. E. (1997). Was Death of Depressed Worker Causally Related: Court Raps Presumption of Ten-Year Link. *The Forensic Psychiatry Echo,* July, 7-8.

Foote, W. E. (1997) Male Boss Behaving Badly, But No Sex Harassment: Complaint Made by Male Employee. *The Forensic Psychiatry Echo,* May, 19-20.

*Foote, W. E. (1996). Victim-precipitated Homicide. In H. Hall (Ed.),*Violence 2000*, Kamuela, HI: Pacific Institute.

William E. Foote, Ph.D.
Curriculum Vitae
Page 18

**PUBLICATIONS** (contd.)

*Goodman-Delahunty, J. & Foote, W. E. (1996). Compensation for Pain, Suffering and Other Psychological Injuries: The Impact of *Daubert* on Employment Discrimination Claims. *Behavioral Sciences and the Law, 13*, 183-206.

*Foote, W. E. (1994). An Interdisciplinary Agreement for Psychologists and Lawyers. In L. Vandecreek, S. Knapp, & T.L. Jackson (Eds.), *Innovations in Clinical Practice* (pp. 255-262). Sarasota, FL: Professional Resource Press.

Foote, W. E. (1990, Winter). On the Ethics of Advertising Mental Health Services. *The New Mexico Psychologist*.

Foote, W. E. (1990, July). Criminal Laws Fails to Deal with Mentally Ill Defendants. *The New Mexico Trial Lawyer, 2*.

Foote, W. E. (1988) Psychological Disability and Testimony Under the 1987 New Mexico Workers' Compensation Statute. *New Mexico Trial Lawyer, 16*, 1, 22, 23.

Foote, W. E., & Word, T. (1984, Fall). The Role of the Vocational Expert in Workers' Compensation Cases. *New Mexico Law Review*. Reprinted in Field, T., Grimes J., and Wees, R. (1985). *Vocational Expert Handbook*, Tucson, AZ: Valpar International. Reprinted in *Workmen's Compensation Law Review* (1986).

*Roll, S. & Foote, W. E. (1984). Psychological Aspects of the Inconsistent Personality Defense. In D.J. Muller, D. G. Blackman, & A. J. Chapman (Eds.), *Perspectives in Psychology and the Law*. New York: John Wiley & Sons.

*Foote, W. E., & Laws, R. (1981). A Daily Alternation Procedure for Altering Sexual Arousal in a Pedophile. *Journal of Behavior Therapy and Experimental Psychiatry, 12*, 267-273.

Waybright, E., & Foote, W.E. (1978). *The Vocational Rehabilitation of the Psychosocially Disabled Client: A Sourcebook*. Hot Springs, AR: Arkansas Rehabilitation Continuing Education Program (limited distribution).

William E. Foote, Ph.D.
Curriculum Vitae
Page 19

## HOSPITAL PRIVILEGES

Presbyterian Hospital, Albuquerque, New Mexico.


## HONORS

Recipient, with Jane Goodman Delahunty, AMERICAN PSYCHOLOGY-LAW SOCIETY BIENNIAL BOOK AWARD for *Evaluating Sexual Harassment: Psychological, Social, and Legal Considerations in Forensic Examinations.* 2005, Washington, DC: American Psychological Association Press. Of this award, the APLS states: "The American Psychology-Law Society Book Award is given for a scholarly book devoted to psychology and law issues. The award is intended to recognize outstanding scholarship in psychology and law."

Fellow, American Psychological Association, January 2002.

PRESIDENTIAL CITATION FOR EXEMPLARY SERVICE TO THE AMERICAN PSYCHOLOGICAL ASSOCIATION IN PSYCHOLOGY AND THE LAW. Awarded by Patrick DeLeon, President of the American Psychological Association, August 6, 2000.

THE HUGO MUNSTERBERG AWARD. Sacramento, California Forensic Psychological Association, May 1998.

1996 AWARD FOR SPECIAL ACHIEVEMENT, American Psychological Association Division 31, Toronto, Canada, August 11, 1996.

PERSISTENCE AND PERFORMANCE AWARD, New Mexico Psychological Association, April 1995.

Invited Participant: National Invitational Conference on Education and Training in Law and Psychology. Villanova University, Philadelphia, Pennsylvania, May 25-28, 1995.

Karl F. Heiser Award for Advocacy From The American Psychological Association, August 12, 1994.

Special Recognition Award, New Mexico Contact. 1990.

Fellow, New Mexico Psychological Association. November 1987.

William E. Foote, Ph.D.
Curriculum Vitae
Page 20

## EDITING AND PEER REVIEW OF PROFESSIONAL PUBLICATIONS

Associate Editor, Professional Psychology Research and Practice, 1998-present

Reviewer, Journal of Psychiatry and the Law.

Reviewer, Psychology, Public Policy and the Law

Member, Editorial Board, The Forensic Echo

Reviewer, Behavioral Sciences and the Law

Reviewer, American Psychological Association Books, 1997-present.

Reviewer, Guilford Press, 1999-present.

## PROFESSIONAL ASSOCIATIONS

American Academy of Forensic Psychology

American Psychological Association
    Division 31 (State Association)
    Division 41 (Psychology and the Law)
    Division 42 (Independent Practice)

New Mexico Psychological Association

Society for Personality Assessment

American Psychological Association:
    Chair, Committee on Professional Practice & Standards, 2005
    Member, Committee on Professional Practice & Standards, 2002-2005
    President, Division 31, 1999
    Program Chair. Joint American Psychological Association/American Bar
        Association Conference: Psychological Expertise and Criminal Justice.
        Washington, DC, October 14-17, 1999
    Board of Governors, National College of Professional Psychology, 1998-
        2001
    Joint American Psychological Association/American Bar Association

William E. Foote, Ph.D.
Curriculum Vitae
Page 21

<u>PROFESSIONAL ACTIVITIES</u> (contd.)

Conference: Psychology and Family Law.  Program committee member.  Los Angeles, California, April, 1997.

Member, Test User Qualification Task Force, 1997-Present

Chair, American Psychological Association Ad Hoc Committee on Legal Issues (COLI) 1996

Member, American Psychological Association Ad Hoc Committee on Legal Issues (COLI) 1994-1996

Member, American Psychological Association/American Bar Association Liaison Committee, 1995-1998

Chair, State Association Caucus, American Psychological Association Council, 1995-1996

Executive Board Member, State Associations Caucus, American Psychological Association Council, 1993-1995

Executive Board Member, Division 31, 1994-1996

Secretary, Rural Health Caucus, American Psychological Association Council of Representatives, 1992-95

American Psychological Association Council Liaison--1985 to 1992.

American Psychological Association Council Representative, 1992-1997

American Board of Forensic Psychology:

President, 2003-2004

Vice President, 2002-2003

Member, Board of Directors,1998-2004

National Chair of Examinations, 2001-2003

Recording Secretary, Board of Directors, 1998-2001

Appeals Chair, 1996-1998; 2006-Present

New Mexico Psychological Association

American Psychological Association Council Representative--1992-1996

Executive Board Member--1985–1996

Judicial Relations Committee Member--1984-89

Ethics Committee Chair--January 1987 to December 1987

President-January 1986 to December 1986

Board Member, New Mexico Council on Crime and Delinquency, 1997-Present.

Vice Chair, New Mexico Council on Crime and Delinquency, 2001-Present

Chair, Southwest Conference on the Law and Psychology, Santa Fe, New Mexico,

William E. Foote, Ph.D.
Curriculum Vitae
Page 22

**PROFESSIONAL ACTIVITIES** (contd.)
        Feb. 4-7, 1993.

Chair, Task Force for the study of legislation concerning the criminalization of psychotherapist sexual misconduct. (A subcommittee of the Governor's Sex Crimes Prevention and Prosecution Committee) 1990-93

Chair, planning group for forensic conference (February, 1992) of the American Academy of Forensic Psychology

Member, planning committee for the American Psychological Association sponsored National Leadership Conference, 1988-90

Secretary/Treasurer, American Academy of Forensic Psychology, 1986-88

Member, Mental Health Code Study Committee--1988

Member, Executive Board, Charter Hospital of Albuquerque- 1987-1988

Chair, Interprofessional Meeting Committee 1987-88

Co-chair, 1985 and 1987, Southwest Conference for the Law and Psychology

Member, Planning Committee for Rehabilitation, New Mexico Workers' Compensation Administration--1986-87

Secretary/Treasurer, Clinical Staff of Charter Hospital of Albuquerque, 1986-1987

        Revised May 1, 2007

William E. Foote, Ph.D.
Curriculum Vitae
Page 23

# FEE SCHEDULE for PROFESSIONAL TIME
## Dr. William E. Foote, Ph.D.

| DESCRIPTION | FEE |
|---|---|
| Clinical Interview (90844) per hour | 200.00 |
| Record or document review (90825) per hour | 200.00 |
| Consultation with client or attorney | 200.00 |
| Travel time per hour, less than 6 hours. | 200.00 |
| Court time, deposition time per hour | 400.00 |
| Report preparation (90889) per hour | 200.00 |
| Extended Work Day (more than 10 hours (per hour)     ```````` | 200.00 |

| | |
|---|---|
| Travel Day or out of town clinic day (6 or more hours) | 2000.00 |
| Testimony Day (6 or more hours) | 4000.00 |