```
 1  JEFFREY J. KUMP
    Nevada Bar No. 5694
 2  MARVEL & KUMP, LTD
    217 Idaho Street
 3  Elko, NV 89801
    Telephone: (775) 777-1204
 4  Facsimile:  (775) 738-0187
    Attorneys for Plaintiff
 5
```

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

| | |
|---|---|
| DA-DAZE-NOM MANZANARES,<br><br>     Plaintiff,<br><br>vs.<br><br>ELKO COUNTY SCHOOL DISTRICT, and GARY LEE JONES, SR., as agent for ELKO COUNTY SCHOOL DISTRICT, and GARY LEE JONES, SR. , individually, and CORPORATION OF THE PRESIDING BISHOP OF THE CHURCH OF JESUS CHRIST OF LATTER - DAY SAINTS, a foreign corporation registered to do business in the State of Nevada; CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS AND SUCCESSORS, a foreign corporation registered to do business in the State of Nevada; and Does 1-5, and XYZ Corporations 1-5.<br><br>     Defendants.<br>_____/ | CASE NO. 3:07-CV-00076<br><br>PLAINTIFF'S REPLY TO DEFENDANTS CORPORATION OF THE PRESIDING BISHOP OF THE CHURCH OF JESUS CHRIST OF LATTER - DAY SAINTS AND CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS AND SUCCESSORS' OPPOSITION TO PLAINTIFF'S MOTION TO AMEND FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL |

COMES NOW, Plaintiff, Da-daze-nom Manzanares, by and through her attorneys, Marvel & Kump, Ltd., and submits the following in reply to the Defendants Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter - Day Saints and Corporation of The President of The Church of Jesus Christ of Latter-day Saints And Successors '(collectively referred to herein as "LDS") Opposition to Plaintiff's Motion to Amend First Amended Complaint And Demand For Jury

dockets.Justia.com

1  Trial.  Plaintiff's Reply is based upon the following points and authorities and the papers and
2  pleadings on file herein and the Affidavit of Martha Seahmer attached hereto.
3      DATED this 20 day of September, 2007.

                                                        MARVEL & KUMP, LTD.
                                                        217 Idaho Street
                                                        Elko, Nevada 89801

                                                        JEFFREY J. KUMP
                                                        Attorneys for Plaintiff
                                                        Nevada State Bar No. 5694

## POINTS AND AUTHORITIES

1. <u>Facts</u>.

   1. The facts as stated in the Complaint and subsequently proposed amended complaints have been presented in good faith to the best of counsel's knowledge, information and belief. No facts have been presented for the purpose of harassment, delay or to needlessly increase the cost of litigation.

   2. In no way does counsel intend to harass or cause delay and counsel shall move to amend any part of the complaint to conform to undisputed evidence.

   3. It appears that Defendants are concerned that Plaintiff's Amended Complaints did not amend enough, and it may be that another is required.

   4. The Plaintiff's mother explained the reliance she had on the Defendant LDS in having Defendant Jones provide counseling to her daughter. (See Affidavit of Martha Seahmer attached hereto as Exhibit "A")

   5. In approximately April of 2000, Plaintiff's father, Benjamin Manzaneras was sent to prison and the family was in serious emotional and financial distress. Plaintiff took the situation particularly hard and was having behavioral problems and struggling in school. One of her teachers at Owhyee Combined Schools suggested that Plaintiff's mother, Martha Seahmer, contact the Bishop of her church, Gary Lee Jones, because he could offer counseling to Plaintiff as well as food assistance to the family. (See Affidavit of Martha Seahmer attached hereto as Exhibit "A")

   6. Mrs. Seahmer did not initially act on this information, but shortly thereafter, she was contacted by Lucille Jones, Gary Jones' wife, on behalf of a ladies organization with the Owhyee LDS Church. Mrs. Jones told Mrs. Seahmer that the church could help her family with food assistance and drove her to Elko, to the LDS food bank located there. Defendant, Gary Jones then started coming to Plaintiff's home, and spoke to Mrs. Seahmer often of the problems he was seeing with Plaintiff. Defendant Jones, told Mrs. Seahmer that as the Bishop of the local LDS Church, he was trained to provide family counseling, and that he could offer counseling sessions to Plaintff. Mrs. Seahmer agreed because Mr. Jones seemed to be knowledgeable and she trusted and respected him as a leader with the LDS Church. (See Affidavit of Martha Seahmer attached hereto as Exhibit

1  "A")

2  7.  Defendant Jones began counseling with Plaintiff nightly at her home just after
3  Plaintiff's father went to prison. Plaintiff was around 13 years of age at the time. He would arrive
4  each night shortly after Martha Seahmer got home from work. This nightly counseling continued
5  for several months, until Marthat Seahmer noticed when she came back from Oklahoma in
6  November 2001, that Defendant Jones was not coming to their house as frequently. (See Affidavit
7  of Martha Seahmer attached hereto as Exhibit "A")

8  8.  Approximately two months into the counseling, Defendant Jones asked Martha Seahmer
9  if he could start taking Plaintiff to his LDS Church with him on Sundays. Martha told him she
10 would leave that decision to Plaintiff. On more than one occasion after that, Martha overheard
11 Defendant Jones try to get Plaintiff to go to his church, telling her that they had lots of activities to
12 offer her. Martha knows that Plaintiff went with him to church on at least one occasion. It is her
13 belief that Defendant Jones was trying to pressure Plaintiff to go to church with him, even prior to
14 asking her permission, based on Plaintiff's behavior at that time. (See Affidavit of Martha Seahmer
15 attached hereto as Exhibit "A")

16 9.  Martha Seahmer believes that Defendant Jones abused his position of authority with the
17 church, and took advantage of the unfortunate situation their family was in to obtain access to
18 Plaintiff to start molesting her. (See Affidavit of Martha Seahmer attached hereto as Exhibit "A")

19 10.  Martha Seahmer was never notified by the LDS Church that Defendant Jones was
20 dismissed from his leadership position in the church at the Owhyee ward because of his relationship
21 with Plaintiff, even though he confessed this to Defendant LDS in December 2001. (See Defendant
22 Jones' Deposition Transcript pages 102 and 103 attached as Exhibit "B"). Martha had seen Mr.
23 Jones talking to her daughter at school and believed their contact was related to continued counseling
24 of Plaintiff, even though he was no longer in affiliation with the church, unbeknowst to her at that
25 time. (See Affidavit of Martha Seahmer attached hereto as Exhibit "A")

26 11.  The report of the Bureau of Indian Affairs interview of Defendant Jones' wife Lucille
27 Jones corroborates Plaintiff's allegations that the "cause of action against the defendants all stem
28 from a relationship that Defendant Jones established with Plaintiff in his capacity as the Branch

1  President of the LDS Church." Ms. Jones reported that sometime after Ms. Seahmer's former
2  husband went to prison, both she and Defendant Jones would counsel and pray with the Manzanares
3  family, and that her husband was then a Bishop in the Church of Latter Day Saints. (Counsel is
4  aware that Defendant Jones was never a Bishop, however this is the title stated in the report and
5  appears to the be how Defendant Jones held himself out to the public. Attached hereto as Exhibit
6  "C")

7  12.    The allegations in the complaint regarding Defendant Jones sexually abusing and
8  molesting Plaintiff from 2001 to 2002 are accurate and supported by Plaintiff's deposition testimony.
9  (See Plaintiff's Deposition Transcript attached in part as Exhibit "D"). Plaintiff testified that
10 Defendant Jones penetrated Plaintiff's vagina with his fingers on three different occasions. (See
11 Plaintiff's Deposition Transcript pages 228 and 229). Plaintiff further testified that one of these
12 occasions was in May of 2002 at the Owyhee Combined School in the girls locker room. (See
13 Plaintiff's Deposition Transcript pages 214 and 215).

14 2. <u>Argument.</u>
15 <u>Motion for Leave to Amend Complaint.</u>
16     FRCP 15(a) provides that "[a] party may amend the party's pleading once as a matter of
17 course at any time before a responsive pleading is served . . . ." "Otherwise a party may amend
18 the party's pleading only by leave of court or by written consent of the adverse party; and leave
19 shall be freely given when justice so requires."
20     Defendant Jones' opposition is based upon the premise that the claims against the church
21 are made in bad faith - not supported by Plaintiff's deposition testimony, and that counsel for
22 plaintiff has not complied with the rules of discovery. It is clear in reviewing the affidavit of
23 Martha Seahmer, as well as the deposition testimony of Plaintiff and Defendant Jones' and police
24 interview of Lucille Jones, that Plaintiff's cause of action is well-supported. Defendant LDS'
25 claims that Plaintiff did not tithe, was not a member, or was not informed of certain
26 organizations or services within the church do not negate the fact that Defendant Jones
27 approached the family to offer his counseling services and various other services on behalf of the
28 church, or the fact that his leadership position within the church was a source of reliance by

1  Plaintiff's mother, Martha Seahmer, in trusting Jones with her daughter.

2  It is bizarre that Defendant LDS has even opposed Plaintiff's Motion to Amend as the
3  amendments requested of the complaint do not even apply to the Church, but rather apply to
4  Defendants ECSD and Jones. Their opposition argues legal issues not relevant to Plaintiff's
5  Motion to Amend, and they have not filed motions pursuant to FRCP 11 or 26f, but appear to
6  argue those issues as a defense to an unrelated motion.

7  Plaintiff agrees with Defendant LDS that another amendment is needed to the complaint
8  to modify the allegation that Plaintiff and her family were members of the LDS church, and to
9  remove the reference to oral sex in the allegations concerning Defendant Jones. Plaintiff does
10 not agree, and the record does not support, Defendant LDS' assertion that no further acts of
11 intercourse occurred in 2002. Plaintiff's deposition testimony is clear that she was fondled and
12 digitally penetrated by Defendant Jones on three occasions after he took her to an Elko motel
13 room in November 2001, and that one of those occasions occurred as late as May 2002 in the
14 girls' locker room at Owhyee Combined School.

15 WHEREFORE, Plaintiff requests that the Court grant Plaintiff leave to file the proposed
16 First Amended Complaint.

17 DATED this 20 day of September, 2007.

MARVEL & KUMP, LTD.
217 Idaho Street
Elko, Nevada 89801

JEFFREY J. KUMP
Attorneys for Plaintiff
Nevada State Bar No. 5694

```
 1  JEFFREY J. KUMP
    Nevada Bar No. 5694
 2  MARVEL & KUMP, LTD
    217 Idaho Street
 3  Elko, NV 89801
    Telephone: (775) 777-1204
 4  Facsimile:  (775) 738-0187
    Attorneys for Plaintiff
 5
 6              UNITED STATES DISTRICT COURT
 7                   DISTRICT OF NEVADA
 8
 9  _____
10  DA-DAZE-NOM MANZANARES,
11              Plaintiff,                    CASE NO. 3:07-CV-00076
12       vs.
13  ELKO COUNTY SCHOOL DISTRICT, and
    GARY LEE JONES, SR., as agent for ELKO   AFFIDAVIT OF MARTHA SEAHMER
14  COUNTY SCHOOL DISTRICT, and GARY
    LEE  JONES,  SR. ,  individually,  and
15  CORPORATION  OF  THE  PRESIDING
    BISHOP OF THE CHURCH OF JESUS
16  CHRIST OF LATTER - DAY SAINTS, a
    foreign corporation registered to do business
17  in the State of Nevada; CORPORATION OF
    THE PRESIDENT OF THE CHURCH OF
18  JESUS CHRIST OF LATTER-DAY SAINTS
    AND SUCCESSORS, a foreign corporation
19  registered to do business in the State of
    Nevada; and Does 1-5, and XYZ Corporations
20  1-5.
21              Defendants.
22  _____/
23
24  STATE OF NEVADA      )
                         )SS
25  COUNTY OF ELKO       )
26       I, MARTHA SEAHMER, after being duly sworn, depose and say that:
27       1.    I am the mother of the Plaintiff, Da-Daze-Nom Manzaneras in the above-entitled
28  proceeding. I make this Affidavit based on my personal knowledge and beliefs.
```

MARVEL & KUMP, LTD.
Attorneys at Law
217 Idaho Street
Elko, Nevada 89801
(775) 738-9881

Exhibit "A"

1

2. In approximately April of 2000, my ex-husband and Da-Daze-Nom's father, Benjamin Manzaneras was sent to prison and our family was in serious emotional and financial distress. My daughter Da-Daze-Nom took the situation particularly hard and was having behavioral problems and struggling in school. One of her teachers at Owhyee Combined Schools suggested that I contact the Bishop of her church, Gary Lee Jones, because he could offer counseling to Da-Daze-Nom as well as food assistance to our family.

3. I did not initially act on this information, but shortly thereafter, I was contacted by Lucille Jones, Gary's wife, on behalf of a ladies organization with the Owhyee LDS Church. Mrs. Jones told me that the church could help my family with food assistance and drove me to Elko, NV to the LDS food bank located there. Gary Jones then started coming to our home, and spoke to me often of the problems he was seeing with Da-Daze-Nom. He told me that as the Bishop of our local LDS Church, he was trained to provide family counseling, and that he could offer counseling sessions to Da-Daze-Nom. I agreed because he seemed to know what he was talking about and I respected him as a leader with the LDS Church.

4. Mr. Jones began counseling with Da-Daze-Nom nightly at our home just after Da-Daze-Nom's father went to prison. She was around 13 years of age at the time. He would arrive each night shortly after I got home from work. This nightly counseling continued for several months, until I noticed when I came back from Oklahoma in November 2001, that he was not coming to our house as frequently.

5. Approximately two months into the counseling, Mr. Jones asked me if he could start taking Da-Daze-Nom to his LDS Church with him on Sundays. I told him I would leave that decision to her. On more than one occasion after that, I overheard Mr. Jones try to get Da-Daze-Nom to go to his church, telling her that they had lots of activities to offer her. I know she went with him to church on at least one occasion. It is my belief that Mr. Jones was trying to pressure my daughter to go to church with him, even prior to asking my permission, based on her behavior at that time.

6. It is also my belief, that Mr. Jones abused his position of authority with the church, and took advantage of the unfortunate situation our family was in to obtain access to my 13-year-old

daughter to start molesting her. I am not unappreciative of the help the church gave us in the form of food and clothing, but our entire family is devastated that Mr. Jones used this assistance as a means to secure contact with Da-Daze-Nom and to put her through the things he has.

7.  I also do not understand why I was never notified by the LDS Church that Mr. Jones was dismissed from his position as the Bishop of the Owhyee ward because of his relationship with Da-Daze-Nom. I did not find out he had been dismissed until the end of the 2002 school year when Mr. Jones himself told me he had been let go. I had seen Mr. Jones talking to Da-Daze-Nom at school and believed their contact could still be explained by him continuing to counselor her, even though he was no longer in affiliation with the church, unbeknowst to me at that time.

8.  Further your affiant sayeth naught.

DATED this 17 day of September, 2007.

_Martha Seahmer_
MARTHA SEAHMER

Subscribed and sworn to before me
this 17 day of September, 2007.

_Joann Iverson_
Notary Public

JOANN IVERSON
NOTARY PUBLIC - STATE of NEVADA
Elko County • Nevada
CERTIFICATE # 07-3450-6
APPT. EXP. JUNE 8, 2011

1

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

-oOo-

COPY

DA-DAZE-NOM MANZANARES,

        Plaintiff,

Case No.
07-CV-00076-LRH-RAM

-vs-

ELKO COUNTY SCHOOL DISTRICT, and
GARY LEE JONES, SR., as agent for
ELKO COUNTY SCHOOL DISTRICT, and
GARY LEE JONES, SR., individually,
and CORPORATION OF THE PRESIDING
BISHOP OF THE CHURCH OF JESUS CHRIST
OF LATTER-DAY SAINTS, a foreign
corporation registered to do business
in the State of Nevada; CORPORATION
OF THE PRESIDENT OF THE CHURCH OF
JESUS CHRIST OF LATTER-DAY SAINTS AND
SUCCESSORS, a foreign corporation
registered to do business in the State
of Nevada; and Does 1-5, and XYZ
Corporations 1-5,

        Defendants.            /

DEPOSITION OF GARY LEE JONES, SR.

VOLUME I

Taken on behalf of counsel for Defendants, pursuant to Notice, at the offices of Robison, Belaustegui, Sharp & Low, 71 Washington Street, Reno, Nevada, at 1:30 p.m., Wednesday, September 5, 2007, before Becky Van Auken, a notary public.

Reported by:            Becky Van Auken, CCR #418, RPR, RMR

CAPTIONS UNLIMITED OF NEVADA, INC. (775) 746-3534

Exhibit "B"

1   wife have a discussion about what had happened in
2   Elko?
3       A   Yes, sir.
4       Q   And was there a disclosure by you that
5   something improper may have occurred?
6       A   Yes, sir.
7       Q   And did you seek to confess your sin to
8   President Alleman?
9       A   Yes, sir.
10      Q   And did you confess to Alleman that you had
11  a relationship outside of marriage?
12      A   Yes, sir.
13      Q   And as a result of that were you released
14  as branch president?
15      A   Yes, sir.
16      Q   And Eric Beaus was appointed?
17      A   Yes, sir.
18      Q   And was that confession in part a part of
19  your repentance?
20      A   Yes, sir.
21      Q   After you were released -- and I think our
22  records show that you were released from branch
23  president December 16, 2007 -- did you continue to
24  participate in the Mormon church?
25      A   Yes, sir.

103

1  Q    But just not as branch president?
2  A    Yes, sir.
3  Q    Did you attend services?
4  A    Yes, sir.
5  Q    Did you attempt to restore yourself to a
6  life of chastity?
7  A    Yes, sir.
8  Q    Did you attempt to fulfill your promise to
9  repent?
10 A    Yes, sir.
11 Q    Have you been successful?
12 A    Yes, sir.
13 Q    Sir, do you recall an incident in
14 approximately August of 2002 where you and your wife
15 went to the Seahmer residence to again disclose what
16 had happened?
17 A    Yes, sir.
18 Q    How did that come about?
19 A    We went there and discussed on what was
20 going on between her and myself, that she was always
21 around where I'm at.
22       And the wife said, That's not right. She's
23 following you like a little puppy all the time
24 wherever you go and what you're doing. And she said,
25 I really don't care for that.

BIA INTERVIEW OF LUCILLE JONES
WIFE TO SUBJECT GARY LEE JONES
SR. ON 8/28/02. JONES ADVISED
THAT HUSBAND ADMITTED TO HAVING
HAD SEXUAL RELATIONSHIP WITH
███████████████████

Exhibit "C"

-1-

## BUREAU OF INDIAN AFFAIRS
## CRIMINAL INVESTIGATIONS UNIT

On August 28, 2002, Federal Bureau of Investigation (FBI) Special Agent (SA) Jack E. Salisbury and Bureau of Indian Affairs (BIA) SA Marc A. Leber made contact with Lucille Moore Jones, DOB: June 1, 1946, SSAN: 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, mailing address P.O. Box 423, Owyhee, Nevada 89832, in reference to a sexual assault. Jones was made aware of the official identity of the interviewing agents and of the purpose of the interview. Jones acknowledged she understood and provided the following information:

Lucille Jones is the wife of Gary Jones, Sr. Lucille Jones advised that sometime after Benjamin ▓▓▓▓ (Martha Seahmer's former husband) went to prison (August 2001), Martha Seahmer (also known as Martha ▓▓▓▓), Seferino ▓▓▓▓ and ▓▓▓▓ became close to and confided in Lucille and Gary Jones, Sr. Both Lucille and Gary Jones would counsel and pray with the ▓▓▓▓ family. Gary Jones, Sr., was then a bishop in the Church of Latter Day Saints (LDS).

It was during this time period that ▓▓▓▓ began having problems in school, and she ▓▓▓▓ began confiding in Gary Jones, Sr., who was employed as the maintenance supervisor at the Owyhee Combined Schools in Owyhee, Nevada. ▓▓▓▓ related to Gary Jones Sr., how Benjamin ▓▓▓▓ had physically abused members of the family. Lucille Jones advised that during this time period she (Lucille Jones) would occasionally visit the Owyhee School to talk with her husband. During these visits Lucille Jones recalled that ▓▓▓▓ was not attending classes but was instead accompanying Gary Jones, Sr., around the campus. Lucille Jones recalled one instance where she (Jones) met with her husband, and she had to tell ▓▓▓▓ to go to class so she could talk with her husband privately. Lucille Jones recalled another instance occurring at a school basketball game in February 2001 where she (Lucille) observed ▓▓▓▓ laying her head on Gary Jones shoulder and clinging to him.

In June 2001, Lucille Jones relocated from the Duck Valley Indian Reservation to Arizona for employment due to her having been laid-off from the Owyhee Community Health Facility.

---

Investigation on __08/28/02__ at __Owyhee, Nevada__
Cross Reference FBI
Case # __H64-I-02-012__; File # __198-F-LV-36569__   Date dictated __August 29, 2002__
by SA Marc A. Leber and SA Jack E. Salisbury

This document contains neither recommendations nor conclusions of the BIA. It is the property of the BIA and is loaned to your agency. It and its contents are not to be distributed outside your agency.

-2-

Sometime during the week of October 28, 2001 Lucille Jones had a telephonic conversation with Gary Jones, Sr., in which Gary Jones told Lucille that he would be traveling to Elko, Nevada to attend two days training provided by the school district and an additional two days of LDS Priesthood training (dates of November 7, 2001 through November 11, 2001).

It was sometime during the above dates (November 7, 2001 through November 11, 2001) when Lucille Jones received a telephone call from her daughter Marlene Jim. Jim informed Lucille Jones that Martha ▮▮▮▮ was having a relationship with a Baptist minister named Rudolph Seahmer. Jim further related that Martha had left the reservation and was staying with Seahmer in Oklahoma, and that Martha had left ▮▮▮▮ in the care of Gary Jones, Sr. Jim stated that Gary Jones, Sr., had taken ▮▮▮▮ with him to Elko. Jim told her mother "It doesn't look right," referring to ▮▮▮▮ being cared for by Gary Jones, Sr. Upon learning of this Lucille Jones immediately returned to Owyhee, Nevada, arriving in Owyhee on Sunday, November 11, 2001. Lucille Jones met with Marlene Jim, and Jim stated to her mother "Something is going on with ▮▮▮▮ and dad" (Gary Jones, Sr.).

It was on this same date (November 11, 2001) that Lucille Jones became aware Gary Jones, Sr., and ▮▮▮▮ had returned to Owyhee and were at the Seahmer residence. Lucille and Marlene Jim drove to the Seahmer residence where Lucille confronted her husband. Lucille asked Gary Jones "What the hell is going on here...are you sleeping with her!?" Gary Jones denied any sexual activity between himself and ▮▮▮▮ and stated that ▮▮▮▮ confides in him.

Later in the evening (November 11, 2001) all immediate family members gathered at the Jones' residence. With family members present Lucille Jones repeatedly asked her husband if he had engaged in sexual intercourse with ▮▮▮▮ Gary Jones, Sr., stated "Well, yah...it just happened...it just got out of hand...it wasn't full-blown sex." Gary Jones, Sr., stated that he and ▮▮▮▮ started to have sex however he was not able to attain an erection. Lucille Jones asked her husband if ▮▮▮▮ knew what she was during the sexual encounter, Gary Jones stated "I don't know." Lucille Jones advised that her husband and ▮▮▮▮ stayed at the AmeriTel Hotel in Elko, Nevada.

Lucille Jones advised during the following months ▮▮▮▮ was still following her husband while both subjects were at the Owyhee School. Lucille Jones told Gary Jones, Sr., that he would get into trouble if the two did not stay away from each other. Lucille Jones stated that her daughters told her that ▮▮▮▮ was obsessed with Gary Jones, Sr.

Lucille Jones advised that during the afternoon of August 26, 2002 while returning home she (Jones) observed both Gary Jones, Sr., and ▮▮▮▮ riding horseback separately on an unpaved road in front of the Jones' residence. Later that day Lucille Jones confronted her husband and he denied that anything was occurring between him and ▮▮▮▮ Gary Jones, Sr., stated that he had told ▮▮▮▮ to stay away from him. Lucille Jones advised that she then personally contacted Martha Seahmer at the Owyhee School and they both agreed to meet at the Seahmer residence later in the evening.

-3-

On August 26, 2002, at about 8:30 PM Lucille and Gary Jones, Sr., met with Rudolph Seahmer, Martha Seahmer and at the Seahmer residence. Lucille Jones advised those present that Gary Jones, Sr., had something to tell them. Gary Jones, Sr., told those present "I had sex with your daughter ███████ four times in November of 2001 at a hotel in Elko." Martha Seahmer asked Gary Jones, Sr., if the information was true and Gary Jones replied "Yah, I guess so." Lucille and Gary Jones then departed the Seahmer residence.

Lucille Jones was unable to provide further information.

Interview terminated.

Note: Midpoint during the interview Gary Jones, Jr., entered the Jones' residence. Lucille Jones informed her son Gary Jones, Jr., the purpose of the presence of the interviewing agents. Gary Jones, Jr., advised his mother that she should not speak with the interviewing agents without the presence of an attorney.

000012

Case No. 3:07-CV-00076

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

-oOo-

DA-DAZE-NOM MANZANARES,

    Plaintiff,

vs.

ELKO COUNTY SCHOOL DISTRICT, and
GARY LEE JONES, SR. As agent for ELKO
COUNTY SCHOOL DISTRICT, and GARY LEE JONES, SR.,
Individually, and CORPORATION OF THE
PRESIDING BISHOP OF THE CHURCH OF JESUS CHRIST
OF LATTER-DAY SAINTS, et al.,

    Defendants.
_____/



VIDEOTAPED DEPOSITION OF

DA-DAZE-NOM MANZANARES

June 26, 2007

Reno, Nevada

SUNSHINE REPORTING SERVICES
(775) 883-7950 or (775) 323-3411
REPORTED BY: GAIL R. WILLSEY CA CSR 9748; NV CSR 359

Page 1

Exhibit "D"

Page 14

1  A    My mom and my stepdad, I believe.
2  Q    Your mother is Martha Seahmer?
3  A    Yes.
4  Q    And your stepdad is Rudolph Seahmer?
5  A    Rudolph Seahmer.
6  Q    When then did you leave Owyhee to go to New
7  Mexico?
8  A    May 28, 2005 after graduation.
9  Q    All right.
10       During the period of May of 2004 to May of
11 2005 during that period of time, did you and Mr.
12 Padilla continue to develop your relationship on the
13 Internet?
14 A    Yes. Well, both Internet and in person.
15 Q    When did you first get together in person and
16 I mean socially, I don't mean intimately?
17 A    Okay. I would say about April 26 of '05 I
18 believe.
19 Q    Okay.
20       So approximately a month before you left for
21 New Mexico, you and he finally had the chance to meet
22 personally?
23 A    Yes.
24 Q    And then within a month, you decided to go
25 live in New Mexico?

Page 15

1  A    Yes.
2  Q    To be with him?
3  A    Yes.
4  Q    Did you begin living together in May of '05?
5  A    Yes.
6  Q    Okay.
7       Have there been any other pregnancies,
8  unsuccessful with him?
9  A    No.
10 Q    Have there been other unsuccessful
11 pregnancies with you?
12 A    No.
13 Q    This is your first time?
14 A    This is my second.
15 Q    When was the first pregnancy?
16 A    I got pregnant in August of '05. The date is
17 the 27th.
18 Q    August of '05 and was that with Mr. Padilla?
19 A    No.
20 Q    Who was the father of your first pregnancy?
21 A    Emmitte Vicente.
22 Q    Okay. Help us with that, please, with the
23 pronunciation and spelling if possible?
24 A    E M M I T T E.
25 Q    Emmitte?

Page 16

1  A    Yes.
2  Q    First name?
3  A    That's his first name.
4  Q    What's his last name?
5  A    Vicente, V I C E N T E.
6  Q    Thank you.
7       And where is Mr. Vicente from?
8  A    The same place, Alamo.
9  Q    Okay.
10       So let me kind of backtrack and get this
11 together. I'm sorry I have to do this but it's
12 important to the case.
13       In April of 2005, you and Mr. Padilla get
14 together personally; correct?
15 A    Yes.
16 Q    And about that time, you make plans to move
17 to New Mexico to be with him?
18 A    Yes.
19 Q    And then in May of 2005, you actually move
20 down to Alamo?
21 A    Yes.
22 Q    And start residing with Mr. Padilla?
23 A    Yes.
24 Q    But then in August of '05, you get pregnant
25 by somebody else?

Page 17

1  A    Yes.
2  Q    Was there a little disruption in the
3  relationship between yourself and Mr. Padilla?
4  A    Yes.
5  Q    Did you break up?
6  A    No.
7  Q    You were still living together when you got
8  pregnant by Emmitte Vicente?
9  A    Yes.
10 Q    How did the pregnancy that occurred with Mr.
11 Vicente, how did that end? Was that through abortion?
12 A    No.
13 Q    How, miscarriage?
14 A    No. I do have the baby.
15 Q    Oh, I'm sorry.
16       So you how old is your baby?
17 A    She's a year and two months.
18 Q    Her name?
19 A    Jackie Lynn Padilla.
20 Q    Jackie Lynn Padilla.
21       So Mr. Padilla is the adopted father of
22 Jackie?
23 A    I just put him on the birth certificate
24 because the other one didn't want to be.
25 Q    The other one, Emmitte, is he financially

Page 26

1 but please bear with me.
2        Was your father abusive of you?
3    A    Sexually, no. Mentally, yes. Physically,
4 yes.
5    Q    And would you describe for us, please, what
6 you mean by physically abusive?
7    A    Hit me with closed fists, open hand, anything
8 that's in his sight like a shoe, stick, a cord or
9 anything any hard object or anything, that's his way
10 of disciplining.
11    Q    Do you recall him being physically abusive of
12 Seferino?
13    A    Yes.
14    Q    The same way?
15    A    Yes.
16    Q    Were injuries sustained by you or Seferino,
17 as a result of this physical abuse?
18    A    Yes.
19    Q    What kind of injuries?
20    A    They would be like marks on our back. My
21 brother has a long scar on his back from the fire
22 poker.
23    Q    Oh, boy.
24    A    And I have a couple of marks on my back.
25    Q    From what?

Page 27

1    A    From the same thing.
2    Q    A fire poker?
3    A    Yes.
4    Q    Was it hot?
5    A    No.
6    Q    Just one that you would use to shake up the
7 ashes?
8    A    Yes.
9    Q    And he would poke you with that?
10    A    Just go like hit you.
11    Q    With a fire poker?
12    A    Yes.
13    Q    And you have permanent scarring because of
14 that?
15    A    Yes.
16    Q    Any other type of physical abuse that he
17 would administer to you?
18    A    He once gave me a black eye.
19    Q    By striking you with his fists?
20    A    Yes.
21    Q    How old were you when that happened?
22    A    I was about six or seven.
23    Q    Okay.
24        Do you know whether or not that abuse was
25 ever reported to the authorities?

Page 28

1    A    Once when I got the black eye because I went
2 to school the next day and my counselors and the
3 principal saw it. I tried covering it up, but they
4 didn't believe me.
5    Q    When you made that report, were you in the
6 same school?
7        I mean is Owyhee just one school, one
8 through --
9    A    K through 12.
10    Q    And what did the authorities do when they
11 found out that your father had beaten you?
12    A    All they did was just took me down to the
13 police department and took pictures and kind of like
14 threatened him to take us away. But they didn't
15 really do any further actions really like putting him
16 in jail or anything like that.
17    Q    But as far as the fire poker, the discipline
18 by striking with the fire poker, that was unreported?
19    A    No.
20    Q    That did not get to the authorities; correct?
21    A    No, it did not.
22    Q    Your mom, was she abusive?
23    A    To me?
24    Q    Yes.
25    A    No.

Page 29

1    Q    To anyone else?
2    A    No.
3    Q    To your brother or sister?
4    A    No. I mean she would give us a spanking but
5 not to the extent of bruising and big welts on your
6 legs or blood or anything like that.
7    Q    You told me that your father also caused you
8 to suffer emotional abuse.
9    A    Yes.
10    Q    And would you describe that for us, please?
11    A    I was afraid to do a lot of things. Each
12 time I would do something if it's not up to his
13 standards, he'll like I guess you could say beat me
14 and stuff like that.
15    Q    That caused you to be constantly fearful and
16 some anxiety about the way that you were conducting
17 yourself?
18    A    Yes.
19        I would always flinch if he would raise his
20 hand to do something or if he would come near me, I
21 would go like that like a little puppy.
22    Q    Yeah, right.
23        Did you ever receive any treatment,
24 assistance because of this emotional or physical
25 abuse?